**UNITED STATES of America, Appellee,**

v.

**Joseph D. NUNAN, Jr., Defendant-Appellant.**

**No. 81, No. 23476.**

United States Court of Appeals Second Circuit.

Argued Jan. 17, 1956.

Decided Sept. 6, 1956.

See also D.C., 121 F.Supp. 405.

Richard J. Burke and J. Bertram Wegman, New York City, for appellant.

Leonard P. Moore, U. S. Atty., Eastern Dist. of N. Y., Brooklyn, N. Y. (Thomas C. Platt, Jr., Asst. U. S. Atty., Brooklyn, N. Y. of counsel), for appellee.

Before MEDINA, HINCKS and WATERMAN, Circuit Judges.

MEDINA, Circuit Judge.

This is an appeal by Joseph D. Nunan, Jr. from a judgment of conviction entered upon the verdict of a jury finding him guilty of income tax evasion, in violation of Section 145(b) of the Internal Revenue Code of 1939, 26 U.S.C. § 145 (b), on each of five counts covering the calendar years 1946 to and including 1950. Appellant was sentenced to five years imprisonment on each of the five counts, the sentences to run concurrently, and a fine of $3,000 on each of the five counts was imposed.

We are urged to reverse and dismiss the indictment or remand for a new trial. The points may be briefly summarized: (1) that there was insufficient evidence to establish the commission of the crime charged and that it was error to deny appellant's motion for a directed verdict; (2) that the motion to strike certain evidence of a long and continuous series of bank deposits in currency and payments to brokerage houses and others in currency should have been granted, because there was no basis for a finding that any of this cash constituted taxable income and because of the alleged prejudicial character of such proof; (3) that appellant was deprived of a fair trial by a variety of rulings admitting and excluding evidence, by allegedly erroneous instructions to the jury and refusals to charge as requested and by additional miscellaneous rulings of one kind and another; (4) that the summation of the prosecutor was inflammatory, irrelevant and improper; and (5) that it was error to deny appellant's motions to quash the indictment, to permit an inspection of the Grand Jury minutes and to suppress certain evidence. These points are proliferated and subdivided into so many separate contentions as to make it a tedious and profitless task to attempt further enumeration.

The validity of each of appellant's points depends as usual upon the factual background disclosed by the record, which at first blush seems extremely complicated and confusing. This seeming confusion, however, as we shall see, is due in no small measure to the fact that both sides leaned heavily on pretrial statements made by appellant to the United States Attorney or to his assistants and to the Grand Jury, he having elected not to testify in his own defense at the trial. These various statements by appellant abound with inconsistencies, contradictions and ambiguities. Moreover, the large number of appellate court opinions of recent vintage in tax evasion cases have furnished a variety of labels or categories; and the zeal of counsel to fix one or another of these labels on the case, or to squeeze it into one or another of these so-called categories, has created the illusion that the basically simple issues are complicated and difficult of resolution.

### Sufficiency of the Evidence.

Appellant is a lawyer who, in addition to his law practice, served as a member of the New York State Legislature from 1930 to 1940. He functioned as Collector of Internal Revenue in Brooklyn, New York, from 1941 to 1944, when he became Commissioner of Internal Revenue in Washington, D. C., serving in that capacity until June 30, 1947. He had been a member of one law firm in New York City for some time, and, after June 30, 1947, became a member of another law firm in Washington.

On February 2, 1951, by H. Res. 78, a Sub-committee of the House of Representatives was set up to "Investigate the Administration of the Internal Revenue Laws." Not long after this, and on June 27, 1951, appellant filed amended joint returns for himself and wife for the calendar years 1949 and 1950. In October, 1951, two Revenue Agents were assigned to do a special examination of appellant.

It soon developed that appellant had no checkbooks or cancelled checks for years prior to 1951. He said he had no personal books or records such as a taxpayer keeps and is required by law to keep in order to substantiate the data set forth in his income tax returns and facilitate verification by those charged with the duty of checking the various items. Moreover, he employed no accountant or other person to assist him but made out his returns himself and no other person has knowledge of the basis for the various amounts stated therein, except such as are mere reproductions of figures supplied by brokerage houses or the bookkeepers of his law firms. Schedules and details plainly required by the printed instructions on the returns were completely disregarded and omitted. Appellant's special knowledge of the tax laws which might have been inferred from his law practice and his experience as Collector of Internal Revenue and as Commissioner of Internal Revenue, with general superintendence over the collection of all taxes and the preparation of the regulations, blanks and forms, was said to be non-existent. He denied that he was a tax expert and said he became a federal revenue officer only by "the chance of politics." He is portrayed in his brief and in his various statements as a sort of political lawyer and business getter. And when the investigating Revenue Agents pointed out the difficulties caused by his lack of any sort of personal records and asked him for a net worth statement, he refused to give it.

So the investigation proceeded and it was discovered that a large number of items of income had been entirely omitted from his returns for the years 1946–1950. Some of these items were small, others were far from negligible in amount. In addition, a close examination of the bank ledgers disclosed a surprising number of deposits by appellant and his wife in currency. These were periodic and continuous, over the years covered by the indictment. The following is the list of such deposits in the year 1946:

| March 9 | $ 300.00 |
| March 29 | 300.00 |
| April 29 | 460.00 |
| April 29 | 200.00 |
| April 30 | 500.00 |
| May 15 | 500.00 |
| May 20 | 550.00 |
| August 23 | 750.00 |
| August 30 | 700.00 |
| August 30 | 750.00 |
| September 5 | 860.00 |
| September 23 | 800.00 |
| September 23 | 500.00 |
| September 30 | 500.00 |
| October 15 | 500.00 |
| October 15 | 550.00 |
| November 7 | 500.00 |
| November 15 | 250.00 |
| December 9 | 900.00 |
| December 12 | 600.00 |
| December 16 | 750.00 |
| Total | $11,720.00 |

When appellant bought some stock in 1946 he handed over to the brokerage house one hundred and sixty $100 bills and fourteen $50 bills. A further single payment of $11,253 in currency was made in the same year.

The amount paid to one dress shop during the prosecution years was $29,500; and of this amount $12,014.86 was paid in currency.

The cash deposits and expenditures during these years totalled $98,092.86; and for the years 1945 through 1950, the Revenue Agents unearthed $160,000 of deposits and expenditures in excess of appellant's reported net income.

Appellant's explanation defies credulity. The ledger sheets of his bank for the years prior to 1937 had been destroyed, so that no evidence was available to show what his balance was in the early thirties or at any time prior to 1937. He knew that safe deposit records showed that he rented a $10 box at the Chemical Safe Deposit Company on July 1, 1935. He said in substance that he had $170,000 in his bank account in March of 1933; that, fearful of the failure of the bank, and during the next two years, he made cash withdrawals in amounts ranging between $2,000 and $5,000, and put the cash in a metal box which was kept on a shelf in the bedroom in his home; that most of this was his wife's money, that he regarded the contents of the box as belonging to them both, and that she had a key; that in 1935 he decided to put the money in a safe deposit box, which was rented for the purpose; that from July, 1935 to the end of 1944 most of the cash was kept in this safe deposit box; and that, finally, he decided to put the money back in the bank, which he did piecemeal and that these piecemeal deposits made periodically over the years 1946 to 1950, which the government claims constituted taxable income, were not income at all but the same old $170,000 fund he started with, less whatever had been expended in the meantime. This is the substance. There were countless variations as he was questioned by the United States Attorney or his assistants, or by the Foreman or by one of the Grand Jurors. The amount withdrawn from the Irving Trust Company was $100,000 or $150,000 or $125,000. The amount he left on deposit in his personal checking account, despite his fears, was $10,000 or $25,000 or $12,000. There were similar variations in his recollection of the amount of cash he kept in the safe in his law office, the amount kept at home, the amount in the metal box in the bedroom closet, and so on.

■ Naturally, the Revenue Agents and the prosecuting officers questioned appellant closely, especially after this belated and fantastic explanation was finally forthcoming. And appellant's pre-trial statements were supplemented by his wife's testimony at the trial. She had inherited a substantial sum from a rich uncle and an additional amount from her father. She said she had turned these funds over to appellant prior to 1932. It also appeared that appellant had made the practice over the years of turning his salary checks, as a legislator and as Collector and Commissioner, into cash; and he made other claims of accumulations of cash. We need not follow in detail the testimony of the Revenue Agent who described at the trial the course of the extensive investigation into each and every item in so far as estate and corporate and other documents and records and interviews with persons able to throw some light on real estate transfers, mortgages, and other matters, might reveal the true state of affairs. Suffice it to say that the net result, on the record as a whole, was evidence amply sufficient to warrant a finding by the jury that there never was any such fund of $170,000 or anything approximating such a sum in appellant's possession in the late twenties or early thirties.

Another phase of the government's proof was a meticulous checking of all available items in order to arrive at an approximate figure representing the amount of appellant's taxable income. This was an arduous task, as it has proved to be in many other income tax evasion cases where the absence of records and the handling of large amounts of currency have made it impossible to do more than demonstrate that the taxable income involved greatly exceeded the amounts shown in the returns. The jury was evidently satisfied that the investigation was conducted in good faith and that appellant was given the benefit of any and all circumstances favorable to his side of the case, as claimed by the Revenue Agent who testified. The evidence warranted such a finding.

The government claimed the following deficiencies for the prosecution years:

| Year | Net Income Deficiency | Tax Deficiency |
|------|----------------------|----------------|
| 1946 | $ 42,489.13 | $33,079.50 |
| 1947 | 19,503.69 | 15,583.44 |
| 1948 | 23,599.48 | 14,641.46 |
| 1949 | 17,818.91 | 11,228.34 |
| 1950 | 23,840.76 | 16,553.86 |
| Total | $127,251.97 | $91,086.60 |

As to the specific items of taxable income which had been omitted from the returns, the substance of the defense was that they had been carelessly overlooked, that the amounts were not significant when compared with the totals of reported taxable income in each of the years in question, and that, if the proof of periodic cash deposits and expenditures was out of the case, the evidence of omission of specific items was insufficient to support a finding of wilful evasion.

Accordingly, we turn to the specific items, which have significance not only in themselves, but for the light they throw upon the cash deposits and expenditures phase of the case.

■■ The mere possession of large amounts of cash or the expenditure of large amounts of cash may well arouse suspicion and speculation, but it is well settled that proof of this, standing alone, will not suffice to establish that the amounts involved constitute taxable income. See Gleckman v. United States, 8 Cir., 80 F.2d 394, 399, certiorari denied, 297 U.S. 709, 56 S.Ct. 501, 80 L.Ed. 996; Graves v. United States, 10 Cir., 191 F.2d 579, 582; cf. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L. Ed. 150; Smith v. United States, 348 U. S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (semble). But when unreported receipts in the indictment years are established by independent evidence, as here, the proof that the receipts derived from a taxable source may be made by proof of a likely source of taxable income, as in United States v. Johnson, 319 U.S. 503, 63 S.Ct.

1233, 87 L.Ed. 1546; Capone v. United States, 7 Cir., 51 F.2d 609, 76 A.L.R. 1534; Guzik v. United States, 7 Cir., 54 F.2d 618; United States v. Costello, 2 Cir., 221 F.2d 668; United States v. Ford, 2 Cir., 237 F.2d 57. The variations of this pattern are legion but a common feature is the necessity for concealment and the method of concealment not infrequently is the use of currency.

Here, as we shall see, there were proofs from which the jury might find that appellant had received fees not included in the earnings of his two law partnerships. Because "of the chance of politics," he was in a position of unusual prominence, in contact with government officials of every rank and stature, and obviously eager and willing to harvest the crop when it was ripe. As a member of two law firms he shared largely in huge partnership income. But he did not hesitate to turn his position as a public figure to account in other ways. And the number of legal fees he concealed not only from the tax authorities but also from his law partners has a special relevancy, in view of his extrajudicial statement that his professional income was reported on the basis of his earnings as they appeared on the partnership books.

In the fall of 1947 Brown & Bigelow Company desired to market some of its securities through Otis & Co. The stockholders' meeting was scheduled for December 6th, and it was necessary to secure a "closing agreement" from the Bureau of Internal Revenue prior to the meeting. The lawyers for the company went to Washington and saw the officials whose duty it was to act in the matter, but were informed that there were so many similar applications ahead of theirs that prompt action was impossible. Appellant, who had ceased to be Commissioner of Internal Revenue about six months previously, was retained and in a few hours, as the result of a telephone call or interview, the business was done, and appellant was paid a fee of $25,000. The details are interesting. After agreeing on a fee of $25,000, appellant acceded to the suggestion that

this be paid in stock, which the president of Brown & Bigelow Company had bought in at $9.50 a share. Accordingly, a computation was made at the nearest approximation; 2,630 shares at $9.50 came to $24,985.00. A bill dated December 28, 1947, was made out by appellant in that amount, duly receipted and sent out to Brown & Bigelow Company in Minnesota; the 2,630 shares were forwarded to appellant on January 2, 1948.

But the bill is not on the billhead of his New York law firm but on an old form of personal, Joseph D. Nunan, Jr., billhead previously used, with the old address crossed out and 55 Liberty Street substituted, and the stock was forwarded to appellant, not at his law office, but at "604 Shore Road, Douglaston, Long Island." The firm bookkeeper had no knowledge of the matter; but appellant claims the jury could have found that other members of the firm knew of this fee and were willing to have appellant keep it all. But the jury may well have found that appellant concealed the fee from his partners. True, one of the partners testified that appellant had told him that Brown & Bigelow Company had "given" him some stock, and on cross-examination he said he "understood" the firm would not receive any of the stock. But this is far from saying that he knew of the services rendered by appellant, or that a fee of $25,000 had been agreed upon and paid. Moreover, the credibility of every one of the witnesses constituted an issue in the case.

It is claimed by appellant that this Brown & Bigelow Company fee is included in his 1948 joint return under the heading of "Other income—$22,500." For the purposes of computing the amount of tax evaded by appellant in 1948 the government was willing to make its calculations accordingly. But there is no possible way of making $22,500 equal $24,985, nor did appellant in any of his various statements give any explanation.

In December, 1949, the Unexcelled Chemical Company retained appellant's firm and paid a retainer of $1,500, which was entered on the firm books. But C. D. Waller, President of the Company, purchased 1,000 shares of bearer stock of Unexcelled, endorsed in blank, at a cost of $2,997.50, for the account of "Mr. Joseph D. Nunan, Jr., care of C. D. Waller, Stamford, Connecticut." In one of his statements appellant claimed the client had said "we are not in a very strong cash position—would you take stock for a fee," and that he put the stock in the safe and "we forgot about it." But no record of the receipt of the stock was made in the firm books and nothing happened until two weeks after appellant was interviewed by the Revenue Agents in 1951, when the stock was sold and the partnership included the proceeds as income for that year. There was testimony by one of appellant's partners to the effect that this was a sort of "contingent" fee not to be taken "until it was earned," but this, under the circumstances, might not have seemed convincing to the jury.

In 1950 Anheuser-Busch, Inc. was about to complete the construction of a new $30,000,000 brewery in Newark, New Jersey. Foreseeing the possibility of complications over "permits and things of that sort" appellant was "put on a retainer" of $500 a month with the understanding that he might be called upon at any time "for legal advice and counsel." He received three monthly payments, aggregating $1,500, in 1950. But none of this reached his law firm, nor is there any evidence that any of the partners knew anything about it. Appellant's explanation before the Grand Jury was that he was hired not to perform legal services but to "try to get * * * Anheuser-Busch beer into certain places in New York."

No item of $1,500 from Anheuser-Busch, Inc. appears in appellant's 1950 return. In one of his statements appellant said two of the payments were included under the description "Other income—$2250" in the original 1950 return and a third in his amended return, filed June 27, 1951, under the heading "Other income—$2750."

Appellant represented a Dr. Jones who had an income tax problem and appellant claimed to have done considerable work on the matter personally. The fee was $7,500 but appellant had certain charities he wanted to help so the fee was paid by a check of $6,000 to the order of his law firm, and two additional checks for $500 and $1,000 respectively, drawn to appellant's order and endorsed over to the charities in which he was interested. The jury would have been justified on the evidence in concluding not only that the firm lost its share of the $1,500 portion of the fee, but that there was at least the possibility that appellant took the charitable deduction twice, one by the simple method above described, and again when he tried to remember, but made no effort to enumerate in detail, as required by the instructions, his gifts to charity during the year, as he filled out his income tax form. He made up a sort of estimate out of his head when writing out his returns, and set down a figure in each return after writing "various church & charities." This figure varied from $5,100 in the 1946 return, $6,050 in 1947, $9,350 in 1948, $9,-600 in 1949, to $11,360 in 1950. He said he "didn't think" he included the two Dr. Jones items in his charitable deductions for that year.

There was a forwarding fee due from the law firm of Glass & Lynch. This was one of the matters which appellant and his firm split on a 50–50 basis. He sometimes received the fee and remitted the firm share later. He received two checks, one dated February 28, 1944, for $3,333.33 and the other dated November 19, 1945, for $8,138.82. The payments to the firm, however, were not 50–50. Of the amount of the first check appellant remitted $1,500, and of the other he remitted $2,830. The result was not only a diminution of the amount owing to the firm, but the government lost income taxes both on appellant's share of what he withheld, or $1,406.08, and also on the firm's share, or another $1,406.07, making a total of $2,812.15 on which no income taxes were paid. Appellant report-ed his income from this transaction only on the basis of that fraction of the fee which he remitted to his law firm. It is futile for counsel to make the explanation in appellant's brief that there may have been disbursements deducted by appellant. No such explanation was made at any time by appellant, nor was there any testimony on the subject, and the even figures of appellant's checks do not indicate any such deduction.

Perhaps appellant's lack of books and records and his giving of lump sum totals here and there in persistent disregard of the printed instructions on the returns, and his omissions to give his firm the share of legal fees to which they were entitled, were due to the fact that appellant was so busy that he developed careless habits. But the jury might have found that there were just too many of these slip-ups, that an honest man with his huge income would naturally keep some sort of books and records and procure the usual assistance in preparing his income tax returns. From the circumstances of the case as a whole the jury was well justified in drawing the inference of wilful evasion.

The way appellant handled the fees above described had a bearing on the sources from which he derived the large amounts of currency deposited and expended. If he withheld from his firm and from the government information of fees which he was paid by check, how much more likely was he to withhold information of fees paid in currency. Especially as such opportunities for enrichment presented themselves as in the Brown & Bigelow matter, where contact with an official almost in the twinkling of an eye resulted in a fee of $25,000. It would be far from strange if services of this character were paid for in cash.

In any event, and before we set forth a summary of the evidence concerning the numerous other omitted items, it may be well to say that it is now apparent, we think, that the interrelation between the currency phase of the case and the so-called specific items is such that the trial judge would have erred

grievously and to the prejudice of the government's case had he stricken from the case all evidence of the periodic cash deposits and expenditures, and appellant's explanations thereof.

Despite the usual explicit statements from his broker he failed to report a capital gain of $544.80 in 1950. He mailed reminders every year to Dr. Kiffney specifying the amount of principal and interest due on a mortgage but failed to report receipt of any of the interest payments, which aggregated $2,278.52 in the five prosecution years. He was paid $1,800 which he won on a wager in 1948, but this was not included in his return. He explained that his gambling losses exceeded this amount in that year, although he must have known that the details of such transactions must be specified if the losses are to be allowed against the gains. There was a persistent and continuous failure in each of the prosecution years to report the full amount of dividends received. In April 1946, the senior member of his law firm died and appellant and another partner agreed to contribute together to the firm the sum of $28,000. As appellant's undistributed earnings for prior years amounted only to $8,474.52, the balance of his $14,000 contribution, or $5,525.48, constituted earnings which he should have reported as such, as they were not otherwise included in his partnership earnings. It is claimed that this is the sort of disputed item one might come across in a civil litigation, but it is hard to see any plausible ground for any bona fide dispute. A few omitted directors' fees make up the balance of the $23,536.30 of specific items of unreported income.

■ None of these items can be considered *in vacuo*. Nor does the sum of them tell the story. Viewed in perspective against the background of the case as a whole we cannot say that the evidence required a ruling that the jury must render a verdict of acquittal. The showing by the government must warrant a finding that the amount of the tax evaded is substantial. Tinkoff v. United States, 7 Cir., 86 F.2d 868; United States v. Schenck, 2 Cir., 126 F.2d 702; Graves v. United States, 10 Cir., 191 F.2d 579. But this is not measured in terms of gross or net income nor by any particular percentage of the tax shown to be due and payable. All the attendant circumstances must be taken into consideration. Here the total gross income reported by appellant in 1946 was $67,823.57 and in 1950, $143,239. But a few thousand dollars of omissions of taxable income may in a given case warrant criminal prosecution, depending on the circumstances of the particular case. Otherwise the rich and powerful could evade the income tax law with impunity. Here, even if the jury had been unable to agree with the contentions of the government to the effect that the cash deposits and disbursements constituted, to the extent alleged, taxable income, still a verdict of guilty would have been warranted by the proof of specific unreported items, viewed in the light of the evidence taken as a whole.

The most serious contention, advanced by appellant in different ways, is that the absence of a statement of his net worth at the beginning of the prosecution period is fatal and that there should at least be a new trial restricted to proofs concerning the specific items of unreported income. It is said that without some proof of appellant's assets prior to the period of periodic and continuous currency bank deposits and expenditures in currency, the effect of the method of proof pursued here deprived appellant of the presumption of innocence and placed upon him the burden of showing that he had not received taxable income in excess of that shown on his returns for the years 1946–1950. We are urged to hold that the requirements of the net worth cases, Holland v. United States, supra; Friedberg v. United States, 348 U.S. 142, 75 S.Ct. 138, 99 L.Ed. 188; Smith v. United States, supra; United States v. Calderon, 348 U.S. 160, 75 S.Ct. 186, 99 L.Ed. 202, must be applied.

■■ But the answer to all this is that each tax evasion case must rest on

its own bottom. This is not a net worth case. All the law requires is that there be proof sufficient to establish that there has been a receipt of taxable income by the accused and a wilful evasion of the tax thereon. It is not necessary to prove that there was a particular amount of tax evaded nor need the computations be exact in an accounting sense. The claim that there is no proof of any probable income-producing source for the cash is completely refuted by the evidence which we have already partially reviewed. The relationship between the various phases of the evidence and the attendant circumstances, such as the complete absence of personal books and records, amply justified a finding by the jury that each of the parts fitted into a pattern of substantial tax evasion. To split the case apart would be to emasculate it.

While it is confidently asserted that there has been no refutation by the government of appellant's statement about his large cash hoard, the fact is that the testimony of the Revenue Agent who testified demonstrated, or at the very least warranted an inference by the jury, that the alleged sources of at least a part of the hoard were fabricated and in many instances exaggerated. Indeed, the description of the metal box and the transfers of cash to the safe deposit box and the curious piecemeal redeposit of the funds in the bank is so fantastic as to provide the basis for its own refutation.

■■ Accordingly, we hold that the motion to strike the evidence of periodic cash deposits and expenditures and appellant's explanations thereof was properly denied, that the state of the evidence did not warrant the granting of the motion for a directed verdict of acquittal, that there was more than ample proof of wilful tax evasion and that the proof relative to the specific items of taxable income which were omitted from the returns in the light of the evidence as a whole was of itself sufficient to support the verdict.

The Instructions to the Jury.

■ Many of the objections to the charge have already been disposed of as they merely repeat contentions advanced in connection with the claim that the evidence was insufficient to support the verdict. There was no occasion to instruct the jury that "the prosecution must establish defendant's net asset position at the commencement of the period," nor to give "a summary of the nature of the net worth method, the assumptions on which it rests, and the inferences available both for and against the accused." Holland v. United States, supra, 348 U.S. at page 129, 75 S.Ct. at page 132. See Gleckman v. United States, supra; Graves v. United States supra; Stinnett v. United States, 4 Cir., 173 F.2d 129.

The instructions relative to the crucial issues were simple and clear. Had appellant received income in each of the years in question upon which there was an income tax due which was wilfully evaded, the exact amount of unreported income need not be established by the government to a mathematical certainty, but there must be a substantial evasion of the tax due.

■ Much is made of the fact that the trial judge refused appellant's Request 18, which reads as follows:

"The government must establish beyond a reasonable doubt that the items claimed to be income to the defendant were income in the years in question. On this you may not speculate nor may the government ask you to speculate or guess. If you believe that the cash deposits and cash expenditures during the years 1946 to 1950 came from an accumulation of cash, accumulated prior to 1946, as stated in substance by defendant, then such cash is not income in the years in question and the defendant was not required to report such cash in the years in question nor was he liable for any income tax on such cash."

While the trial judge did not adopt the exact language thus proffered, nor did he cover the same matters in sequence, his instructions adequately and clearly covered the substance of each of the propositions therein contained.

With reference to the first sentence of Request 18, the court charged, "The government must prove to you beyond a reasonable doubt that the defendant wilfully avoided the payment of taxes known to be due upon income received during the years specified in the indictment." Moreover, the jury were instructed not to speculate or guess.

Of course it was important that the jury should know that if the cash deposits and cash expenditures made in the indictment years came from currency accumulated by appellant in prior years, as claimed by appellant, he was not liable for any income tax on this cash. But this was not an issue which crept into the case *sub silentio*; the pros and cons were referred to again and again in the testimony of various witnesses and in the arguments of counsel. It was as plain as a pikestaff that if the currency deposits and expenditures came from cash in appellant's possession prior to 1946, then this same cash could not be found to be taxable income in the prosecution years. That the jury might have labored under some misunderstanding on the subject seems no more than a hypothetical possibility, too remote from the realities of the trial for serious consideration. In any event, the short answer is that the instructions sufficiently covered the point.

Thus the jury were told that the burden rested exclusively on the government, that "the defendant need not prove to you that expenditures were made from prior accumulations and a source other than taxable income for the years specified in the indictment." And, in a portion of the instructions quoted below, it was made plain to the jury that they were to decide whether appellant had unreported income on which the tax was wilfully evaded, "or whether or not the money was received by the defendant prior to 1946 and therefore is not income."

But appellant contends that certain language in the charge may well have been understood by the jury as a statement "that the cash deposits in banks and the expenditures had been proved by evidence to constitute the financial returns from appellant's occupation." No such inference, we think, is justified when this portion of the charge is read in its entirety. It is as follows:

"The Government has submitted proof in support of its charges of evasion of income taxes and understatements of income by evidence that the defendant had a lucrative occupation, the financial returns from which were reflected in bank deposits, in known receipts and expenditures. It is claimed that the total of these, eliminating duplications, was in excess of the reported income. The claimed differential between the two is the alleged understatement upon which the claimed differences are based.

"It is your function, members of the jury, to determine whether there was such a differential and if the differential was income and whether the tax thereon was wilfully evaded. It is for you to determine whether or not upon all of the evidence the defendant had unreported income, the tax whereon was or was not wilfully evaded, or whether or not the money was received by the defendant prior to 1946 and therefore is not income."

Thus, after stating the claim of the prosecution, the trial judge left it to the jury to say whether there was unreported income or whether, as asserted by appellant, "the money was received by the defendant prior to 1946 and therefore is not income."

Had it been supposed that this was any more than a statement of the broad outlines of the claims of the parties on this phase of the case, counsel should have drawn the matter to the attention

of the trial judge and requested a clarification, but he did not.

### Deductions, Contributions and Miscellanea.

Exception was taken, however, to a statement to the jury with reference to the $1,800 gambling gain above referred to, that "gambling losses are not deductible unless so claimed and supported." This statement was in all respects accurate. Appellant, after all his experience as a lawyer who handled income tax matters for clients at least occasionally, and after his service as Collector and as Commissioner of Internal Revenue, must have known that he was not entitled to deduct alleged gambling losses without claiming them on the face of the return. This was part of the background the jury was called upon to consider.

It is said that the trial judge, even if not specifically requested to do so, was under a duty to explain to the jury that if appellant honestly believed no tax was due on this item of $1800 they could not find that appellant wilfully evaded the tax thereon. But there is nothing in this. The instructions on the subject of wilfulness were lucid and explicit; the jury must have understood that what was said on that subject applied to each and every item of alleged unreported taxable income.

A few other miscellaneous points may well be disposed of here, as they have to do with certain requirements of law which were relevant to various phases of the case but which appellant says were brought in to his prejudice.

From the very outset of the case, when the returns and amended returns were being offered in evidence, appellant objected to reference to the printed instructions requiring the enumeration of "deductions and contributions," no specific items appearing on the returns and no attached schedules. This particular contention was based upon the statement in the government's Bill of Particulars, "No disallowance of deductions or exemptions claimed."

But it was not the function of the Bill of Particulars to set forth every detail of what the jury was warranted in concluding was appellant's elaborate and ingenious scheme of operations. The lack of any personal books or records, the making out of the returns himself, the persistent disregard of instructions obviously designed to prevent tax evasion and the use of odd lump sums which could be said to mean almost anything desired if, as and when the evil day arrived and Revenue Agents began to investigate, may well have appeared to the jury, in the light of the evidence as a whole, as part and parcel of appellant's method of tax evasion.

There was nothing in or out of the Bill of Particulars which should have led the trial judge to rule out evidence that appellant had retained no record of his contributions to charities, that he never kept any record of his cash contributions, that he could not identify any of the contributions from memory and that aggregates in round figures in his returns, characterized as "Various church & charities" were no more than guesses or estimates. Naturally the prosecutor commented on this item in his summation and he was plainly entitled to do so.

There was never any concession by the prosecutor that the deductions were "proper," as claimed by appellant, or that they were properly set forth on the returns. Nor did appellant ever claim that the two checks of $1,000 and $500 paid on the Dr. Jones' fee, were included in his total of contributions for the year in which he endorsed those checks over to the two charities in which he said he was interested.

An analogous objection is made with reference to the $24,985 fee for expediting the rendition of the "closing agreement" in the Brown & Bigelow Company matter. When appellant said the item "Other income—$22,500" in his 1948 return represented this item, the government was willing to make its calculations of the amount of tax claimed to

be evaded at $2,485, the difference between the fee received and the amount claimed to be reported. But this furnished no basis for keeping the full details of the transaction from the jury, as they were relevant to the periodic currency deposits and expenditures phase of the case, and especially so on the issue of motive, intent and wilfulness.

■ Nor was there error in rejecting the proffered evidence of the bid and asked prices of the Brown & Bigelow Company stock on a when, as and if issued basis, on January 5, 1948, the mean of which is said to be 8⅝ rather than the 9½, which was the basis used when the fee was agreed upon. This evidence could have served no other purpose than to confuse the jury. All the evidence in the case showed an agreed fee of $24,985, the amount of appellant's receipted bill. He made no statement at any time to the effect that he intended to enter on his return the amount the stock might be deemed worth according to the market quotations, nor was any evidence produced on his behalf to indicate that he did so. No calculation made on the basis of the alleged bid and asked prices on January 5, 1948, could be made to come to $22,500.

Moreover, the argument made in the prosecutor's summation, that this fee was not disclosed to appellant's partners, was amply justified, as indicated in an earlier portion of this opinion.

Considerable argument is devoted to the amended returns, two of which were filed on June 27, 1951, shortly after the passage of the Resolution of the House of Representatives, setting up the Subcommittee to "Investigate the Administration of the Internal Revenue Laws," above referred to, and shortly before the two Revenue Agents were assigned to investigate appellant's personal income tax situation. The relevancy of these amended returns to the government's case will appear from a single illustration.

In 1949, one of the officers of American Lithofold Corporation, which manufactured business forms, conferred with appellant over the possibility of getting business for the firm through the medium of appellant's "prominence in the neighborhood," meaning New York City. Appellant was accordingly employed and made a vice-president of the company. Some cards were printed with appellant's name as vice-president and he went around to see some customers and sent out a number of letters. For these services he was paid on February 28, 1949, $750, on March 31, 1949, $750 and on April 30, 1949, $750. A further payment was made to appellant of $1,200 in 1950. The 1949 return, as originally filed on January 16, 1950, made no reference to the amounts received from American Lithofold Corporation in that year. In the 1950 return, filed on January 12, 1951, there is an unexplained lump sum statement, "Other income—$2250." The amended return for 1949, filed on June 27, 1951, contains a new item, "Other income—$2250," the equivalent of the three $750 payments above described; and, in the amended 1950 return, filed June 27, 1951, the original statement, "Other income—$2250" is raised to "Other income—$2750." Appellant claimed that the 1949 amended return of "Other income—$2250" represented the payments received from American Lithofold Corporation in 1949. His claim about the "Other income—$2750" in the 1950 amended return is obscure to us, partly because of his answers during the investigation relative to the Anheuser-Busch payments referred to in a foregoing portion of this opinion.

■ In any event, the filing of the amended returns under the circumstances could give appellant no immunity on account of any prior wilful misstatement or omission of taxable income. It was for the jury to consider these items of proof together with all the other evidence in the case and give them such probative weight on the issues as the jury might decide upon.

Much is made of the fact that appellant had a right to file amended returns

at any time, and, although not included in the requests for instructions submitted prior to the charge by the trial judge, counsel in a colloquy in the absence of the jury, relative to exceptions to the charge as given, requested the trial judge to supplement his charge by a further instruction "that an amended return does not have to be filed before March 15th, but can be filed at any time." The occasion for this is said to be that in his summation the prosecutor had said: "Now for that year, 1949, when the return was filed on January 16th—and please contrast this with the first one where, on March 12th, he filed an amended return (1946), and we took the amended return because he had a right to file an amended return at any time before the 15th of March."

But no objection had been made to this statement by the prosecutor, which was of trifling significance, and the trial judge wisely, as we think, thought it would not be helpful to emphasize such a point just before the jury retired for its deliberations; and he remarked "if you had made objection at the time we could have said something about it."

We can see no error here. Nothing but confusion and distraction from the main issues could have resulted from the discussion at that stage of the trial of such a minor point. It was well within the discretion of the trial judge to grant or refuse the request.

■ Two exhibits, consisting of a letter from Gaylord Container Corporation, dated March 15, 1946, requesting a ruling on a proposed stock split-up, and a reply acceding to the request, signed by appellant as Commissioner, dated March 27, 1946, were received in evidence subject to connection. They were not read or shown to the jury; the connection failed to materialize and they were stricken together with the testimony of the witness who identified them. The prosecutor made no comment about these exhibits, and the instructions of the trial judge to the jury to disregard the exhibits and the testimony amply protected appellant. United States v. On Lee, 2 Cir., 193 F.2d 306, 310, affirmed 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270; Berlin v. United States, 3 Cir., 14 F.2d 497, 499; Looker v. United States, 2 Cir., 240 F. 932.

■ It is alleged that the trial judge erred in receiving over objection proof of borrowings by appellant's wife, overdrawings of her bank account and similar evidence which, according to the claim of the prosecution, constituted conduct inconsistent with the existence of the cash hoard in the metal box in the bedroom closet. We are told that the wife was extravagant, that she concealed her borrowings from appellant and that what she did has no relevancy to the charge against appellant.

But appellant stated that his wife turned over to him the money she inherited from her uncle and from her father, that he considered the accumulation of cash in the metal box to belong to both of them and that she had a key to the box. Moreover, appellant stated that she had no income of her own and that all her cash deposits and cash expenditures came from currency he gave to her. Under these circumstances we think the evidence of her borrowings was admissible. 8 Wigmore, Evidence (3rd Ed., 1940) Section 2232(1).

Appellant's brief contains some twenty odd specifications of what are alleged to be improprieties of the prosecutor in his closing statement to the jury. In a few instances objection was made at the time by interrupting the summation, but nothing was said about most of these supposed improprieties until a motion for a new trial was made later. There are six instances of alleged inflammatory appeals to prejudice, three "intimations" of personal knowledge on the part of the prosecutor of facts either not in evidence or contrary to the evidence, and a large number of statements or arguments which appellant claims are without support in the evidence or contrary to the evidence or which called upon the jury to speculate.

■ Most of the items relied upon are matters of trivial consequence. Counsel was entitled to argue the inferences to be drawn from the proofs, and the jury was instructed that statements by the lawyers in summation are not proof and that the recollection of the evidence by the jury was what they should take into consideration in arriving at their verdict.

The so-called inflammatory appeals turn out to be nothing of the kind. What was said about the Brown & Bigelow Company fee and how it was earned was not only proper but necessary, if the jury were to understand the significance, according to the prosecution's theory of the case, of the legal fees earned by appellant and not turned over to his law firm. Appellant still insists that the firm knew about this fee but the evidence could have justified a finding by the jury to the contrary, as we have already pointed out. So also, with reference to the prosecutor's comments relative to appellant's claim that the moneys he received from Anheuser-Busch were not legal fees but for prospective efforts to get Stevens to sell Anheuser-Busch beer at the ball parks and race tracks. We have already adverted to appellant's claim that he was not a tax expert and to his method of entering lump sums in his returns, despite the plain printed instructions which required details and annexed schedules, if necessary. It was perfectly proper for the prosecutor to refer to the fact that appellant was "top man," as Commissioner of Internal Revenue for part of the prosecution period, and that by law he was responsible for the collection of all taxes in the United States.

■ True it is that the prosecutor argued that the large amount of currency claimed by appellant to be in his accumulated hoard would not go in a $10 safe deposit box, although the precise dimensions of the box had not been proved. But this was fair argument, and the same may be said of his state-ment that he too graduated from law school in 1923 and knew that the remuneration young lawyers received in those days "was never as much as we thought would be commensurate." He also said that after the Bank Holiday in 1933 none of the large banks in New York City had any difficulty. This was objected to and there was a colloquy in which the trial judge said he would leave it to the jury to recall what the testimony was. Things of this sort come up in practically every trial and we find no basis whatever for any finding of impropriety.

■ In his summation defense counsel had argued that the government should have had one of its agents go to the bedroom closet in the Douglaston house, where appellant lived when he said he kept the metal box with the cash there, and take measurements and photographs. In response to this the prosecutor commented: "In his summation, Mr. Burke criticized me for not taking photographs and measurements. Mr. Burke would have been the first to have objected to my photographs, objected because they would have been taken in 1954 and would not fairly represent a thing twenty years ago." This was legitimate argument; and we find no evidence that the prosecutor "went so far as to brandish before the jury photographs never identified or offered."

■ There is no merit in any of the claims of impropriety on the part of the prosecutor; and we think it unnecessary further to discuss this phase of the case.

### The Motion to Suppress.

■ Reversal of the judgment of conviction is also urged on the ground that it was obtained by the admission of evidence, the use of which was prohibited by 18 U.S.C. § 3486, since amended.[1] This issue was raised by a motion to suppress, argued before trial and renewed at the commencement of the trial, and by objections to the introduction of certain evidence. We hold that the motion was properly denied, and the objec-

1. Act of August 20, 1954, c. 769, § 1, 68 Stat. 745.

tions were properly overruled. The statute then provided:

"No testimony given by a witness before either House, or before any committee of either House, or before any joint committee established by a joint or concurrent resolution of the two Houses of Congress, shall be used as evidence in any criminal proceeding against him in any court, except in a prosecution for perjury committed in giving such testimony. But an official paper or record produced by him is not within the said privilege."

Appellant testified before the King Committee, above referred to, on September 12, 1951 and March 18, 1952; none of this testimony was offered in evidence at the trial. But appellant was interrogated privately on many occasions by the two revenue agents assigned to investigate his income tax returns and he made certain records available to them, such as the books and records of his law firms, certain photostatic copies of existing records of his bank account and records of his accounts with brokerage houses.

The substance of appellant's contention on this phase of the case is that the revenue agents were acting as agents of the King Committee, that what he told told them from time to time in the course of their investigation and the documents he made available to them served as clues or leads to other items of proof, and that all this came within the purview of the immunity statute quoted above.

The testimony of Revenue Agent Saldana at the trial indicated that he and his fellow investigator were not connected with the King Committee but that, after their investigation was under way, they were told to cooperate with the King Committee by answering any questions put to them by the Committee and they had done so. There is no dispute about the fact that, at their first interview with appellant, they told him they desired to make a reexamination of certain of his income tax returns "on behalf of the Bureau of Internal Revenue."

But we need not pursue the question of whether, and to what extent, the two revenue agents may be said to have in some way represented the King Committee, as we agree with the interpretation of the statute made by the Court of Appeals for the District of Columbia in United States v. Brennan, 94 U.S.App. D.C. 184, 214 F.2d 268, 270, certiorari denied 348 U.S. 830, 75 S.Ct. 53, 99 L.Ed. 655. There counsel for the Committee informed the defendant "that the Committee, acting through me, would like to see you and ask some questions about the facts." Defendant appeared before Committee counsel with his lawyer, who took the position that none of his client's answers could be used against him in any criminal proceeding, and the answers were given. The court held, nevertheless, that the motion to suppress must be denied, as Committee counsel was "not an organic part of the Committee which can be composed only of members of Congress", and the statute had no application to statements made to agents or employees of the Committee, which did not constitute " 'testimony given by a witness * * * before any committee of either House' ". We do not see how we can hold otherwise, in view of the explicit wording of the statute.

The Motions to Quash the Indictment and Inspect the Grand Jury Minutes.

The appeal also brings up for review an order of Chief Judge Inch, denying appellant's motion to quash the indictment, or, in the alternative, to permit an inspection of the minutes of the proceedings before the Grand Jury.

On February 18, 1952, the Grand Jury was impanelled in the Eastern District of New York and commenced to hear witnesses; the indictment against appellant was returned on December 2, 1952; the motion to quash the indictment or inspect the minutes of the Grand Jury was denied on March 19, 1953; the trial commenced on June 8, 1954.

The motion to quash is based upon: (1) a series of sensational newspaper articles and radio and television publicity, between February and September 1952, that is to say, both prior to and during the sessions of the Grand Jury; (2) certain incidents which are said to evidence a controversy between the legislative and executive branches of the government relating to the investigation of appellant's conduct, culminating in the service of a Grand Jury subpoena on Congressman Kean, who gave certain testimony, all of which is claimed to have violated appellant's right to an impartial tribunal, under the Fifth and Sixth Amendments; and (3) the alleged absence of any competent or adequate evidence to warrant the return of the indictment.

As the various disclosures brought to light by the King Committee affected some of the highest ranking officials in the Internal Revenue Service, including appellant, it was inevitable that the resulting publicity would be sensational in character, and much of it was unfair, misleading, and, at least to some extent, untrue and unwarranted. But we are not dealing here with alleged bias or prejudice by a petit jury, caused by widespread publicity during or just prior to a trial of the issues, as was the case in Meyer v. Cadwalader, C.C.E.D.Pa., 49 F. 32 and Griffin v. United States, 3 Cir., 295 F. 437. In such a situation much would depend upon the character of the publicity, proof that it was of such a nature as to be likely to make an impression on the jurors, and the steps taken by the trial judge to mitigate or remove its effect. Instructions that jurors must avoid reading newspapers or listening to or looking at radio and television commentators and that their verdict must be based solely on the evidence introduced in the case in court, will generally suffice. But there must be a careful appraisal of the possibility or likelihood of extraneous influence. And, indeed, there is good sense in this, since petit jurors must remain passive spectators of the court room drama.

But a Grand Jury is not confined to a passive role, but may and often should proceed on its own initiative. 4 Stanford L.Rev. 68, 69, 77–8; Dession, From Indictment to Information, 42 Yale L.J. 163, 176. That it is induced to such action by newspaper reports forms a continuum with its historic function of ferreting out crime and corruption, and is in no way inconsistent with its duty to decide on and in accordance with the evidence adduced before it.

Doubtless the Chairman and members of the King Committee, charged with the duty to "Investigate the Administration of the Internal Revenue Laws," feared that the proceedings before the Grand Jury might be used to "whitewash" appellant and others. We are not concerned here with the removal of the Committee files to Washington, and their subsequent return. Nor was there the slightest impropriety on the part of the Grand Jury in bringing Congressman Kean before it and hearing his testimony. Indeed, this would seem to have been its plain duty in the premises.

We agree with the finding of Chief Judge Inch that the record is barren of any evidence that the grand jurors were prejudiced or coerced by the publicity or by anything said or done by any member of the King Committee. Quite to the contrary, there is every reason to suppose that the Foreman and other members of the Grand Jury pursued the investigation conscientiously and with diligence. Their refusal to be intimidated by what they may have considered to be legislative sound and fury, is commendable. It must not be forgotten that they heard witnesses over a considerable period, and did not return the indictment for some months after appellant had testified before them and provided out of his own mouth evidence which was far from lacking in probative force. And appellant has made much of the fact that at no time did he refuse to answer any question on the ground that the answer might tend to incriminate him.

We find no merit whatever in the contention that there was insufficient evidence before the Grand Jury to justify the return of the indictment. It may well be that some of the evidence was not properly received, but it is well established law that the submission to a grand jury of some incompetent proof is not a ground for dismissing the indictment. Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021; Cox v. Vaught, 10 Cir., 52 F.2d 562; United States v. Pearlman, D.C.S.D.N.Y., 247 F. 158; Joyce, Indictments § 138 (2d ed., Blakemore, 1924); cf. Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, affirming, 2 Cir., 221 F.2d 668.

Accordingly, we do not reach and need not decide the question of whether 18 U.S.C. § 3486, above referred to, applies to grand jury investigations. It was held in United States v. Smyth, D.C. N.D.Cal., 104 F.Supp. 283, 307, that the statute only forbade the use on a trial of testimony taken before a Congressional Committee. We have some doubt about the soundness of this ruling. But here, in addition to the excerpts from appellant's testimony before the King Committee, which were read to the Grand Jury, the record discloses that the Grand Jury had considerable other evidence before it, which we find it unnecessary to catalogue.

An effort is made by appellant to eliminate from consideration on this point testimony before the Grand Jury of the Revenue Agent Saldana, who testified at great length at the trial. The basis for this particular argument is the following single question and answer contained in Saldana's testimony before the King Committee, given at a time when the Grand Jury was midway in its investigation:

"Q. Do you actually have any evidence that the $97,000 expended or deposited during the five years constituted unreported income to Mr. Nunan upon which any taxes were due? A. We do not."

But this is the old story of selecting a brief quotation here or there and disregarding the rest. There appears to have been evidence before the Grand Jury of several of the specific items of unreported income; at the time Saldana gave the answer to the question above quoted the grand jury investigation was incomplete; and it seems not improbable that the witness meant merely that he had no direct, as contrasted with circumstantial, evidence, that the amount of the cash deposits and expenditures constituted unreported income.

Accordingly, we cannot say that appellant has overcome the strong presumption of regularity accorded to the deliberations and findings of grand juries, e. g., United States v. Gooding, 12 Wheat. 460, 6 L.Ed. 693; Radford v. United States, 2 Cir., 129 F. 49; Nanfito v. United States, 8 Cir., 20 F.2d 376; Joyce, Indictments § 140 (2d ed., Blakemore, 1924), or that the district judge abused his discretion in denying the motion to quash.

Nor would we be warranted in holding that it was an abuse of discretion to deny the motion for an inspection of the Grand Jury minutes. United States v. Garsson, D.C.S.D.N.Y., 291 F. 646; United States v. Violon, C.C.S.D. N.Y., 173 F. 501; cf. United States v. General Motors, D.C., 15 F.R.D. 486, which collects the cases on page 487, notes 2, 2a.

There is no merit in any of the other contentions of appellant and we find it unnecessary to discuss them.

Judgment affirmed.