STATE of Maine

v.

Michael BROWN.

Supreme Judicial Court of Maine.

Feb. 4, 1980.

Henry N. Berry, III, Dist. Atty., Peter G. Ballou, Deputy Dist. Atty., Portland, Mary Gay Russell (orally), Law Student Intern, for plaintiff.

· Ricky L. Brunette, Portland (orally), for defendant.

Before McKUSICK, C. J., WERNICK, GODFREY and NICHOLS, JJ., and DU-FRESNE, A. R. J.

WERNICK, Justice.

Defendant Michael Brown has appealed from a judgment of conviction entered in the Superior Court (Cumberland County) on the verdict of a jury finding him guilty of the attempted murder of Kimberly McGowan. The appeal presents two issues: (1) whether the evidence was legally sufficient to support the conviction; (2) whether defendant was subjected to irreparably improper prejudice depriving him of a fair trial because the prosecutor asked Kimberly McGowan, when she was testifying, the characterizing question whether it was an "accident" that she was shot, and she answered: "Hell no."

## 1.

■ The issue of the legal sufficiency of the evidence was saved for appellate review when the presiding Justice denied defendant's motion for judgment of acquittal made at the close of the evidence.

We must decide whether, as contended by defendant, the evidence is legally insufficient because, viewing the evidence most favorably to the prosecution, a juror, to be rational, would have to entertain a reasonable doubt regarding the existence of one, or more, of the essential elements constituting the crime charged against defendant.[1]

More particularly, defendant asserts that a juror, to be rational, could not avoid having a reasonable doubt that the discharge of the handgun which caused bodily injury to Kimberly McGowan may have been *accidental*, having been caused by the crash.

This being so, since the instant indictment charged the crime of murder sought to be completed as defendant's "intentionally or knowingly" causing the death of Kimberly McGowan (17–A M.R.S.A. § 201(1)(A)), and since the crime of "at-

---

1. This states the meaning in negative terms, of the legal insufficiency of evidence to meet the constitutionally mandated standard of proof beyond a reasonable doubt. It is the same meaning *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979) states in affirmative terms to describe evidence that would be legally *sufficient*:

". . . after viewing the evidence in the light most favorable to the prosecution, any *rational* trier of fact *could have found* the essential elements of the crime beyond a reasonable doubt." (emphasis added).

tempt" requires that defendant shall have acted with

"the kind of culpability required for the commission of the crime [to be completed], and with the intent to complete the commission of . . . [it] . . .," (17–A M.R.S.A. § 152)

defendant argues that the evidence was legally inadequate because it would not prevent a rational juror from having a reasonable doubt that defendant "intentionally or knowingly" fired the gun "intentionally or knowingly" to cause Kimberly McGowan's death.

We reject defendant's contention.

Taking the evidence most favorably to the prosecution, the jury had warrant to find the following facts.

For a long time prior to the critical events here at issue, which occurred on November 25, 1978, defendant and Kimberly McGowan had maintained an intimate relationship, in the course of which they became the parents of a son. Several days prior to November 25th, after she had had an argument with defendant, Kimberly took their son, who was three years of age, and went to stay at the home of her aunt and uncle in Harrison, Maine. At about 8:00 p. m. on November 25th the defendant and his brother, Jon Brown, appeared unannounced at the house in Harrison. Defendant came into the house holding a .22 caliber handgun. He insisted that Kimberly dress and leave with him. Believing that the gun was unloaded, Kimberly's mother, who happened to be present, lunged at the defendant three times, once with a fireplace poker. Defendant pushed her away each time, using his free hand.

During the next hour, during which defendant gave the gun to his brother, who put it in his back pocket, there was general discussion about whether Kimberly should go with defendant. Kimberly at last decided to accompany defendant and his brother and to bring the child with her. As defendant left the house, he apologized to Kimberly's uncle for having made a disturbance, explaining that he was only trying to save his relationship with Kimberly.

The foursome left Harrison in an automobile, headed for Portland. Defendant's brother, seated alone in the front seat, was driving. The other three were sitting in the back, with Kimberly in the center and the defendant sitting at her right. Soon after they started for Portland, defendant took back the gun from his brother. At times he twirled it in his hand; for a short while, he allowed his child to play with it; ultimately, he took it back and kept it, for the most part, in his lap.

During most of the trip to Portland defendant and Kimberly talked about reuniting. Among other things defendant told Kimberly, as he had on prior occasions, that if he couldn't have her, he wanted no one else to have her. He also said that he would shoot her "if . . . [her] mother had called the police.".

On the trip to Portland defendant's brother drove over the Maine Turnpike, and from the Turnpike, took the approach to Portland over Route 295 which passes through South Portland. A South Portland police officer spotted the vehicle as a possible stolen vehicle. He began to pursue it, and the pursuit developed into a high-speed chase in which several Portland police units also became involved. During the chase, Kimberly slouched down upon the back seat, and she braced herself by holding her legs firmly against the front seat. The chase ended when the car operated by defendant's brother collided at an intersection with a Blazer truck, skidded into two parked vehicles and came to rest.

At some time, either between the collision with the Blazer truck and the automobile's coming to a stop, or just after it stopped, the handgun was discharged, wounding Kimberly in the lower part of the back of her head. Either just before, or just after, the gun was discharged, Kimberly felt one or two fingers of defendant's hand on the back of her head.

Almost immediately after the automobile came to a stop defendant and his brother rushed out and fled. Later, still holding the handgun, defendant appeared at the house

of a friend, where he stayed for approximately two or three hours until he was arrested. Defendant's friend noticed that he was "shaken" and that his "eyes were quite blurry as if he had been crying." At least twice, defendant told his friend: "I shot her" (referring to Kimberly). One time, he said he shot Kimberly in the head; another time, he said he shot her in the neck. Defendant also told his friend, speaking somewhat hysterically, that he thought he had killed Kimberly.

From these warranted findings of fact the jury could rationally conclude beyond a reasonable doubt that defendant was guilty of the crime of attempted murder charged against him. Defendant's threats to Kimberly would support a conclusion that defendant had intent to kill her. More particularly, the jury could rationally find that because of the police pursuit, defendant decided that the police had been called by Kimberly's mother and that defendant then undertook to carry out what he had threatened if that happened. Moreover, defendant's statements, during the two or three hours he spent with his friend, that he had shot and probably killed Kimberly, especially since defendant at no time gave the slightest intimation to his friend that the crash had caused the gun to be accidentally discharged, could be strong evidence to the jury that defendant intentionally fired the gun with intention to kill Kimberly. It was for the jury to say whether defendant's statements to his friend were his admissions of such intentional conduct rather than merely figurative expressions of responsibility by a person overwrought and anguished because his reckless or negligent handling of the gun had caused someone dear to him to be shot.

The evidence was sufficient to support a jury conclusion beyond a reasonable doubt that defendant intentionally shot Kimberly McGowan with the intention to cause her death. The jury, therefore, had adequate basis to find defendant guilty of the crime of attempted murder charged against him.

### 2.

We turn to defendant's second contention, that the prosecutor was guilty of misconduct which caused such irreparably improper prejudice to defendant that his trial was rendered unfair.

The record reveals the incident at issue as follows:

"Q. Was this shooting an accident?

"A. Hell no.

"MR. STEARNS: [Counsel for the codefendant, Jon Brown] Objection.

"THE COURT: The objection is sustained. The answer will be stricken and the jury is instructed to disregard it."

█ First, we disagree with defendant's purported characterization of the asking of the question as "prosecutorial misconduct." Even if the question is to be held improper, as seeking an inadmissible opinion from the witness, this conclusion is not so obvious that the prosecutor could not think it at least arguable that the question was proper, as seeking to elicit a shorthand characterization of rapidly occurring events tending to form a basically unitary perception. (Rule 701, M.R.Evid.) The prosecutor's conduct is, therefore, more fairly to be described as error rather than the highly reprehensible behavior signified by the label "prosecutorial misconduct."

█ Second, this error by the prosecutor is not error that the defendant saved for appellate consideration. It was the attorney for the codefendant, Jon Brown, who objected to the question. Jon Brown had not been charged with attempted murder. Hence, the situations of the two codefendants, as well as the potential for prejudice to each, were sufficiently different to preclude treatment of Jon Brown's objection as automatically attributable to defendant Michael Brown.

█ In any event, third, the presiding Justice struck from evidence Kimberly's response to the question and immediately instructed the jurors that they must disregard it. Also, in his final instructions the Justice reminded the jurors that they were "entirely" to disregard whatever they had heard that had been ordered stricken as

evidence. Defendant at no time asked for a mistrial and never made the contention at trial that Kimberly's answer to the allegedly improper question was so dramatic that it would expect too much of human nature to believe that the jurors could forget, or disregard, the answer.

Defendant, therefore, must be taken to have acquiesced in the curative approach which the presiding Justice thought adequate. *See State v. Pomerleau,* Me., 363 A.2d 692, 698 (1976). Had the presiding Justice deemed the error so irreparably prejudicial as to put the fairness of the trial in question, he had the authority to grant a mistrial on his own motion. Instead, he saw fit to rely on curative instructions. This Court generally defers to the determination of a presiding Justice, who has the immediate feel of what is transpiring, that a curative instruction will adequately protect against the jury's giving consideration to matters which have been heard but have been stricken as evidence. *See State v. Butts*, Me., 372 A.2d 1041, 1042 (1977). We find nothing exceptional, here, to cause us to believe that the jury would not follow the presiding Justice's instructions.

The entry is:

Appeal denied.

Judgment of conviction affirmed.

POMEROY, ARCHIBALD and GLASSMAN, JJ., did not sit.