STATE of Maine

v.

**Gary MAHANEY and David Bradbury.**

Supreme Judicial Court of Maine.

Argued Sept. 15, 1981.

Decided Dec. 1, 1981.

**614**

Charles K. Leadbetter and William R. Stokes, Asst. Attys. Gen. (orally), Augusta, for plaintiff.

Daniel G. Lilley (orally), Portland, for Mahaney.

Richardson, Tyler & Troubh, Thomas L. Goodwin (orally), Portland, for Bradbury.

Before McKUSICK, C. J., and GODFREY, NICHOLS, ROBERTS, CARTER and WATHEN, JJ.

WATHEN, Justice.

Appellants were indicted in November, 1979 by a Grand Jury in Aroostook County for the 1974 murder of Randy Blanchard.[1] Venue having been transferred to Kennebec County, jury trial was held and both defendants were convicted of murder. This appeal follows their convictions. We deny the appeals.

The issues raised on appeal are: (1) whether defendants were unfairly restricted in their cross examination of a firearms expert; (2) whether the admission of statements of the deceased that he thought he was going to be killed was harmful error; (3) whether the court's supplementary instructions requiring the jury to continue deliberating after it had reported a deadlock were impermissibly coercive; (4) whether Gary Mahaney should have been provided with a transcript of the Grand Jury proceedings; (5) whether the trial judge erred in instructing the jury that it could find David Bradbury guilty as a principal in the second degree; (6) whether Bradbury was denied his right to a speedy trial; and (7) whether there was sufficient evidence to support the verdict of guilty beyond a reasonable doubt.

The essential facts, as the jury would have been warranted in finding them, can be briefly summarized as follows. At the time of the homicide in 1974 a feud was in progress in the Mars Hill area between the Smith family and the Mahaney family. The victim, Randy Blanchard, a friend and associate of both factions found himself deeply embroiled in the dispute. He had participated in the burning of Gary Mahaney's trailer a few months prior to the homicide. Blanchard spent the evening of December 14 drinking beer with both defendants. The Smiths were also looking for him on that night. Testimony indicated that Blanchard was afraid of both defendant Mahaney and Jeff Smith.

The body of Randy Blanchard was found in his car on December 16, 1974, in a remote area of Westfield, Maine, called the burntlands. The examining pathologist recovered six bullets from the body and attributed the death to gunshot wounds to the head. The estimated time of death was between midnight and 2:00 A.M. on December 15, 1974.

The State presented Corporal William J. Manduca, a firearms identification expert who testified that in his opinion the murder weapon was a gun shown by other evidence to have been purchased by Jonathan Spicer, loaned to Gary Mahaney's brother in July, 1974, and returned to Spicer by another of Mahaney's brothers in 1977. Two defense experts testified that the Spicer gun was not the murder weapon.

The State also presented evidence of admissions made by the defendants several years after the body of Blanchard had been found. Defendants' statements, introduced

---

1. Because the murder was committed in 1974, this case was tried under the pre-Code statute 17 M.R.S.A. § 2651 which provides as follows:

"§ 2651. Definition

"Whoever unlawfully kills a human being with malice aforethought, either express or implied, is guilty of murder and shall be punished by imprisonment for life."

at trial through other witnesses, acknowledged that either one or the other of them had shot Randy Blanchard. According to the witnesses, Mahaney at one point said Bradbury had shot Blanchard, and another time said that he himself had shot a man and left him in a car in the burntlands. Another witness testified that Bradbury claimed he had shot Blanchard. Other relevant facts will be noted hereafter in conjunction with the discussion of the issues raised in this appeal.

*Restriction of Cross-Examination.*

■ Defendants argue that they were unfairly restricted in their opportunity to attack the credibility of Corporal William Manduca through cross examination of Manduca and through direct testimony of an investigating officer in another homicide case. Manduca, a State firearms identification expert for thirteen years, testified that in his opinion the bullets extracted from Randy Blanchard's body had been fired from the .357 Magnum which had been given to one of Gary Mahaney's brothers in July 1974 and returned to its owner by another brother in 1977. Manduca's identification of the murder weapon was subsequently contradicted by two defense firearms identification experts.

On cross examination, Manduca was asked by defense counsel:

"Q. Do you recall any instances where you testified under oath, as you're doing here today, identifying a weapon as having fired a particular projectile and subsequently found out you were wrong?"

"A. No, sir.

"Q. Do you remember the Poitraw homicide.

"A. Yes, sir, very clearly.

"Q. Are you saying that that didn't happen in the Poitraw homicide?

"A. No, sir, it did not."

The court sustained the State's objection to that line of questioning citing M.R.Evid. 403. "I am only going to try this case, not on that . . . ."

Defendants argue that the trial justice erred in curtailing further inquiry of Manduca concerning his testimony in the unrelated homicide case. Because Manduca was the only expert identifying the gun traced to Mahaney's brothers as the murder weapon and because his identification was disputed by two other firearms identification experts, defendants argue that an attack on Manduca's credibility was highly important to the establishment of their defense.

M.R.Evid. 403 permits a trial judge to exercise his discretion and exclude even relevant evidence

"if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

*See State v. Poland,* Me., 426 A.2d 896, 898 (1981); *State v. DiPietro,* Me., 420 A.2d 1233, 1235 (1980). In making its 403 determination the Court asked defense counsel if they were prepared to put on evidence of what happened in the *Poitraw* case. At three points in the record, counsel for the defendants made what they deemed an offer of proof regarding the matter. First, counsel stated that "more than one police official" had told him that Manduca had made "some conclusions under oath that had to do with firearms identification . . . and his conclusions were completely in error." Next he stated that "various police officials" had indicated to him that Poitraw had been indicted for murder on the basis of Manduca's testimony before the Grand Jury and had subsequently pled to a lesser offense when Manduca switched his testimony. Finally, when the State sought to attack the qualifications of a defense firearms expert by questioning him on his participation at another trial, defendants renewed their offer of proof, stating that Detective Camick was willing to testify about Manduca's role in the *Poitraw* case:

"I would like to add to that offer of proof by indicating that . . . I have inquired of the investigating officer in that case who has informed me that in fact Corporal

Manduca misidentified the weapon in that case, turned around and identified another weapon after he had misidentified and testified to another weapon in that case."

■ There was nothing in the offer of proof that could enhance the probative value of the proposed line of questioning. There was no indication of the source of Detective Camick's information; neither was there any indication that the evidence proffered to rebut Manduca's denial would be admissible. An offer of proof must not only detail the proposed testimony but must also support the admissibility of that testimony. *State v. Mishne*, Me., 427 A.2d 450, 455–56 (1981); *State v. Flemming*, Me., 409 A.2d 220, 224 (1979).

The record before us does not justify a finding that the trial justice abused his discretion by excluding testimony of Manduca's alleged misidentification of a firearm in the *Poitraw* case. The offer of proof was not adequate to support the admission of the excluded testimony. Moreover, Corporal Manduca had qualified as an expert in Maine courts approximately four hundred times. Therefore, even if the proffered testimony were admitted and believed, it would merely have demonstrated that once out of those four hundred times, Manduca had made a mistake.[2] Unlike a showing of bias or prejudice, the probative value of this type of discreditation is not so great that it substantially outweighs the danger of misleading the jury and the undue delay that would be occasioned by the introduction of extensive evidence of the other trial. The trial justice therefore did not abuse his discretion in balancing relevance against potential delay and confusion. While the record does not articulate extensively the trial justice's analysis, it does make clear that the justice considered the relevance of the proffered testimony as against the delay and confusion resulting from a trial within a trial. *See State v. Poland, supra.*

*Admission of Deceased's Statements.*

■ Defendant Mahaney argues that the admission of statements of the deceased that he was afraid he was going to be killed and from which it could be inferred that he thought defendant Mahaney was going to kill him constituted harmful error. Although we agree that the admission of the statements was error, we find that error harmless.

Donny Rideout testified that at 9:30 P.M. on December 14, he had had a conversation with Randy Blanchard about the burning of Gary Mahaney's trailer, in which, according to Rideout, both he and Blanchard had participated. Rideout testified that Blanchard said "he thought someone was going to get shot right off, and he thought it was going to be him." Initially the court admitted the evidence over defense objections as proof of the corpus delicti and as "evidence of the motive of the person who may ultimately have committed the crime." Later the State sought to introduce a statement through Randy Blanchard's mother that Blanchard had been carrying a gun because he was afraid. The court sustained an objection to that testimony. On cross examination, defense counsel asked Mrs. Blanchard if she had bailed her son out of jail after he had been arrested for carrying a concealed weapon on the morning of December 14, 1974; she replied affirmatively. The State again requested that it be allowed to inquire as to the reason for Blanchard's carrying the gun. The court agreed to admit the testimony under M.R. Evid. 803(3) as a state of mind exception to the hearsay rule.

Mrs. Blanchard then stated that Randy "said that he was afraid that someone was going to kill him, and that he wanted—if anybody took a shot at him, he wanted to be sure to get a shot at them."

The presiding justice admonished the jury to consider Mrs. Blanchard's and Rideout's statements only for the purpose of as-

---

2. The witness was not asked whether he made a mistake but rather whether *he recalled* making a mistake. Moreover, the witness was asked if he had identified a weapon in the unrelated case and he responded that he had identified only the cartridge cases. Such phrasing makes it difficult, if not impossible, to establish that the witness was untruthful.

certaining the issue of what the decedent's state of mind was.

In *State v. Cugliata*, Me., 372 A.2d 1019 (1977), we recognized that the state of mind hearsay exception was limited to evidence that is

"highly relevant and uttered in circumstances indicating its truthfulness above and beyond the reliability presumed of all statements of present mental state." *Id.* at 1027.

Although the challenged statements might have been relevant in that they tended to negate an inference of suicide, they were essentially cumulative on that point, for other evidence showed that Blanchard's body was found with six bullets in it and with no gun in the area. Therefore, evidence of the victim's state of mind does not meet the "highly relevant" standard prescribed in *Cugliata, supra*, and its admission was error.

We must disagree, however, with defendant's characterization of that admission as harmful error. Under M.R.Crim.P. 52(a) "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." The classic formulation of the test for harmless error is found in *Kotteakos v. United States*, 326 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946):

"If one cannot say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Id.* at 764, 66 S.Ct. at 1248.

In the instant case, the erroneously admitted testimony was sufficiently cumulative of other testimony that it is unlikely the judgment was swayed by it.

The statements attributed to Blanchard did not identify the source of his anxiety. If the statements were viewed as referring to Mahaney, there was other evidence from which the jury could equally well have inferred that Blanchard was afraid of Mahaney. The defendant Mahaney confronted the victim at the victim's residence concerning his participation in the burning of the trailer. Blanchard's cousin testified that defendants accosted him, and Mahaney told him that if he procured a gun for Randy he should "get enough for your whole family because I'm going after Randy because he burned my trailer." According to the testimony of Conrad Kinney, two weeks before Blanchard's death Mahaney and Bradbury had asked him to bring Blanchard out behind Mars Hill Mountain so they could talk to him about the burning of Mahaney's trailer. Kinney informed Blanchard of the request and told him also to "pretend he was mad and take off" because Kinney "didn't want to see anyone get hurt."

Although defendant Mahaney contends that the challenged testimony must have swayed the jury because without it there was little evidence to link him to the murder, this assertion is inaccurate on two levels. First, neither statement directly links Mahaney to the expected murder. Both are ambiguous as to the object of Blanchard's fears, and there was evidence showing that Blanchard was also afraid of Jeff Smith. Defendant's assertion is also inaccurate because there is substantial other evidence linking Mahaney to the murder, not the least of which are the admissions by both defendants that Mahaney had participated in the killing. Because the erroneously admitted statements were ambiguous, and if not ambiguous, cumulative, we find the error in their admission harmless.

*Supplementary Jury Instructions Requiring Continued Deliberations.*

■ Defendants argue that the court's supplementary instructions requiring the jury to continue deliberating after it had reported a deadlock constitute reversible error because of their coercive effect on the deliberations of the jury. Although the trial justice exceeded the language from the American Bar Association charge adopted by this Court in *State v. White*, Me., 285 A.2d 832, 838 (1972), no objection was raised to the charge at trial, and we fail to find that it rises to the level of manifest error.

Having been instructed that they were "under no time constraints" and that they might have to deliberate "through the supper hour, if that becomes necessary," the jury retired at 3:00 P.M. At 8:30 P.M., after one interlude for a reading of testimony, the jury sent a note to the presiding justice saying that they had voted several times, the final vote was 7–5 and all the jurors had stated that they would not change their minds under any circumstances. At this point the presiding justice called the jury back. He repeated the essence of the A.B.A. approved instructions, as follows:

"You have a duty to consult with one another and to deliberate with a view of reaching a verdict if it can be done without sacrificing individual judgment. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors.

"In the course of your deliberations and discussions, you should not hesitate to re-examine, re-evaluate and reassess your own position and views, and change your opinion if you are convinced that that opinion is erroneous. You should not surrender an honest belief or conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

"The statement from this note says that all of the jurors have verbally stated that they will not change their minds under any circumstances. I am assuming that you mean under the present state of your discussions."

He then continued:

"I am going to require you to continue deliberating, continue discussing the evidence in this case, because if you should fail to reach a decision, this case is left open and unresolved. Another trial would be a heavy burden for all parties concerned. There's no reason to believe that the case can be tried again any better than it has been."

No objection was raised to these instructions, and the jury returned a guilty verdict at 9:50 P.M.

At the outset we note that one hour or more is not such an unreasonably short time for a divided jury to reach a verdict that a finding of coercion is mandated on the basis of the time alone.

It should also be noted that while *State v. White, supra*, disapproved the use of what is known as the *Tuey-Allen* charge, it did not hold that any deviation from the A.B.A. standards was coercive. The issue in this case is whether these instructions are in fact coercive and productive of manifest error.

Under the A.B.A. standards a deadlocked jury may be sent out for further deliberations

"as it is believed the jury should not be permitted to avoid a reasonable period of deliberations merely by repeated indications that it is unable to agree." A.B.A. Standards Relating to the Administration of Criminal Justice, *Trial by Jury* § 5.4 (Commentary, 1968).

Moreover, the standards, as adopted in *State v. White, supra*, provide that the court may require the jury to continue deliberating and may repeat the approved instructions, as long as the court does not require deliberation for an unreasonable amount of time.[3] More than five hours is not an unreasonable amount of time for deliberation in a complex murder trial. Therefore, the procedure employed by the justice was not coercive and would not merit a reversal.

In examination of the charge itself, we proceed on the premise that where no objection has been raised at trial to the instructions given by the court, the Law Court's review will be limited to whether the offending instruction

---

**3.** 14 M.R.S.A. § 1106 limits to three the number of times a jury may be returned to the jury room.

"when viewed with the charge as a whole constituted highly prejudicial error tending to produce manifest injustice." *State v. Doughty*, Me., 399 A.2d 1319, 1326 (1979).

The charge in question included no imposition of a deadline on the jury, a factor which has been found impermissibly coercive by this Court. *State v. Stevens*, Me., 343 A.2d 592 (1975). It did include a variation of the elements of the now rejected *Tuey-Allen* charge. The offending language in *Tuey-Allen* instructed the jury that there was no reason to believe that the case would ever be submitted to a better jury and urged minority dissenters to reconsider their positions. *Allen v. United States*, 164 U.S. 492, 501–02, 17 S.Ct. 154, 157, 41 L.Ed. 528 (1896); *Commonwealth v. Tuey*, 62 Mass. (8 Cush.) 1 (1851). Although the *Tuey-Allen* instructions were disapproved of by the Court in *State v. White*, 285 A.2d at 837, that Court refused to find them coercive *per se*. *Id.* at 837. In the instant case the justice admonished the jury that, if they should fail to reach a verdict, the case would be left open and unresolved, placing a heavy burden on all the parties.[4] Urging the jury, split 7–5, in these terms to try to reach a verdict is much less coercive than the *Tuey-Allen* insistence that one or two hold-out jurors reevaluate their position in light of the fact that the evidence had been so persuasive to their fellow jurors.

Moreover, the charge before us is proper in substantial part and includes the A.B.A. approved language that the jurors

"should not surrender any belief or conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict."

Therefore, the charge in its entirety is at worst ambiguous. Whatever the coercive effect of the *Tuey*-like aspects, they are diluted by the contradictory statements in the A.B.A. charge, and it cannot be said that such a charge is "highly prejudicial error tending to produce manifest injustice."

*Release of Grand Jury Transcript.*

Defendant Mahaney contends that the Grand Jury transcript should have been released to him for use in preparing his case and later for use as an impeachment device at trial. Rule 6(e) M.R.Crim.P. provides, and this Court has recently affirmed, that requests for inspection of a Grand Jury transcript shall only be granted upon a showing of particularized need. *State v. Doody*, Me., 432 A.2d 399 (1981); *State v. Cugliata*, Me., 372 A.2d 1019 (1977). Defendants based their claim of particularized need on the possibility that either the five year gap between the homicide and the indictment or the drug habits and criminal records of presumed Grand Jury witnesses had given rise to inconsistencies between the Grand Jury testimony and that given at trial. In *Doody* we held that the general statement "there may well be inconsistencies in the testimony of other witnesses," made without specific reference to the alleged inconsistencies, cannot constitute particularized need. *State v. Doody*, 432 A.2d at 402. Since defendants merely alleged that "there may be changes, some serious contradictions here," they failed to make a showing of particularized need[5], therefore, under *Doody* and *Cugliata*, the hearing justice's refusal to release the transcript was proper.

The defendant continued to request that the transcripts be released after the Grand

---

4. It should be noted that the trial justice has a duty to assure himself that the jury is genuinely deadlocked before declaring a mistrial and if he fails to do so double jeopardy may bar a retrial. *State v. Linscott*, Me., 416 A.2d 255, 260 (1980).

5. In *Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), upon which defendant relies, the passage of seven years between the time of the Grand Jury testimony

and trial was held to constitute particularized need for release of the transcript because the Grand Jury testimony was so much fresher. In the present case, however, although defendant complains of the five year gap between the offense and indictment, only one year had elapsed between the Grand Jury and trial so there was little question of witnesses having forgotten their testimony.

Jury witnesses had been called for the State.

We are cognizant of the argument that the policy reasons for Grand Jury secrecy [6] are not served by withholding the Grand Jury transcript after the witnesses have testified publicly. It is unnecessary for us to decide the issue in this case. The presiding justice reviewed the transcripts *in camera* to determine whether any possible basis existed for releasing the transcript to defense counsel. Our own reading of the Grand Jury transcript reveals no inconsistencies that would have provided a basis for impeachment at trial. Therefore, even if the trial justice should have tipped the balance in favor of the defendant and released the transcript after the Grand Jury witnesses had testified at trial, his failure to do so in this case would have been harmless error.

*Speedy Trial.*

■ Defendant Bradbury contends that the almost eight month delay between his arraignment in April, 1980, and trial in December, 1980, constitutes a denial of his right to a speedy trial. We disagree.

This Court has consistently applied the standards of *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), when a deprivation of speedy trial is asserted. The threshold inquiry, before the four-part *Barker* analysis need be undertaken, is whether the delay complained of is presumptively prejudicial. *State v. Dudley,* Me., 433 A.2d 711 at 713 (1981). As we stated in *State v. Goodall,* Me., 407 A.2d 268, 280–81 (1979):

> "In view of the time and effort that both the defense and prosecution ordinarily require to prepare for the trial of a complicated murder case, such as this one, we doubt whether an eight-month delay takes defendant's claim over the threshold in order to justify further inquiry into the other factors enunciated in *Barker*."

Nothing sufficiently differentiates this case from *Goodall* to warrant a finding of presumptive prejudice.[7]

*Jury Instructions on Principals in the Second Degree.*

■ The presiding justice instructed the jury on the elements of felonious homicide

6. These reasons were enumerated by us in *State v. Levesque,* Me., 281 A.2d 570 (1971): "(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he had been under investigation, and from the expense of standing trial where there was no probability of guilt." *Id.* at 573 (quoting *United States v. Rose,* 215 F.2d 617, 628–29 (3rd Cir. 1954).

7. We note, however, that this case was apparently not scheduled for trial during the eight months. Undoubtedly the Clerk of Courts left the case unscheduled until the case was ready for trial. It is the preferred practice to schedule the case in the ordinary course and leave to the parties the option of requesting a continuance.
Even if the eight month delay in this case were found to be presumptively prejudicial, an

evaluation of the delay in light of the four *Barker* factors does not yield a finding of deprivation of the right to a speedy trial. The length of the delay was not excessive. Prosecutions with significantly greater delays have been sanctioned by this Court. *See, e.g., State v. Smith,* Me., 400 A.2d 749 (1979) (25 months); *State v. Carlson,* Me., 308 A.2d 294 (1973) (13 months). Moreover, defendant made ten pretrial motions; the delay entailed in resolving these motions is attributable to defendant's actions and cannot be charged against the State in weighing appellant's claim for a speedy trial. *State v. Smith,* Me., 400 A.2d 749, 753 (1979); *State v. Lewis,* Me., 373 A.2d 603, 609 (1977). Defendant was duly diligent in asserting his right both in a demand for a speedy trial and in two motions to dismiss for failure to provide a speedy trial. Thus, he has met the third *Barker* factor. There was not, however, significant prejudice to the defendant caused by the delay. Although he was incarcerated, this prejudicial element was mitigated by the fact that the period of delay was used to the benefit of the defendant. *See State v. Goodall,* Me., 407 A.2d 268 (1979). Four months of the eight month delay were passed in securing a change of venue in order that defendant might obtain a fair and impartial trial.

punishable as murder. He followed this with an instruction on criminal liability as a principal in the first or second degree. Defendant Bradbury argues that there is no evidence upon which he can be found guilty of murder as a principal in the second degree. We find no merit in this contention.

 Three witnesses testified to admissions of the defendant, that David Bradbury had shot Randy Blanchard in the presence of Gary Mahaney. A fourth witness testified that Mahaney said he had shot a man, but the testimony does not mention Bradbury's presence at the shooting. Defendant contends that the jury must believe only one of the accounts of the shooting, neither of which places him in the position of a principal in the second degree. This Court has recently stated, however, that the fact-finder has "the prerogative selectively to accept or reject" testimony presented "in terms of the credibility of the witnesses or the internal cogency of the content." *In Re Fleming*, Me., 431 A.2d 616, 618 (1981). Therefore, the jury might readily have believed both the testimony which had Mahaney committing the murder and that which placed the defendants together at the time of the events.

*Sufficiency of the Evidence.*

 Defendants contend that the evidence is insufficient to establish beyond a reasonable doubt that they caused the death of the deceased. Under Maine law the conviction must stand, however, unless viewing the evidence in the light most favorable to the prosecution, on all the evidence presented no rational trier of fact could find proof of guilt beyond a reasonable doubt. *State v. Perfetto*, Me., 424 A.2d 1095, 1097 (1981); *State v. Brown*, Me., 410 A.2d 1033, 1034 (1980).

In this case evidence was presented from which a jury could conclude that Randy Blanchard had burned Gary Mahaney's trailer, that Blanchard was with the defendants at 11:45 P.M. a few hours before the estimated time of his death, and that the murder weapon was a gun that had been given by its owner to one of Maha-

ney's brothers before Blanchard's death and returned to him by another brother in 1977. Moreover, four witnesses testified to admissions by defendants that one or the other of them had killed Randy Blanchard. Although much of this testimony was contradicted, all factual questions must be resolved in favor the jury's verdict. *State v. Perfetto, supra*, at 1097; *State v. Boyer*, Me., 392 A.2d 41, 42 (1978). Therefore, there was ample testimony from which the jury could have found guilt beyond a reasonable doubt.

The entry must be:

Judgment as to defendant Mahaney affirmed.

Judgment as to defendant Bradbury affirmed.

All concurring.