STATE of Maine

v.

Clence L. VALENTINE.

Supreme Judicial Court of Maine.

Argued Jan. 8, 1982.

Decided April 2, 1982.

Charles K. Leadbetter, James R. Erwin (orally), Asst. Atty. Gen., Augusta, for plaintiff.

Francis M. Jackson (orally), South Portland, for defendant.

Before McKUSICK, C.J., and GODFREY, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ.

ROBERTS, Justice.

Clence L. Valentine was tried in Superior Court, Cumberland County, for the intentional or knowing murder of Coletta Tripp, 17–A M.R.S.A. § 201(1)(A) (Supp.1980).

In a bifurcated trial,[1] after the court denied Valentine's motion for acquittal, a jury found him guilty of the lesser included offense of manslaughter. Valentine thereafter withdrew his previous plea of not guilty by reason of insanity and was adjudged guilty of manslaughter, 17–A M.R.S.A. § 203 (Supp.1980). On appeal Valentine challenges the denial of his motion for judgment of acquittal on the grounds that the evidence was insufficient to support a finding of a culpable state of mind and asserts that the trial court erred when it (1) allowed the admission of statements Valentine made to a police officer; (2) permitted the jury to consider evidence which indicated he had previously attacked the victim; and (3) excluded U. S. Coast Guard records offered by the defense to show ratings of good conduct. We affirm the judgment.

## I. FACTS

Valentine and the victim, Coletta Tripp, began living together in 1973. During the course of their relationship they had one child. Another child, born to Tripp prior to 1973, also lived with them. The relationship between Valentine and Tripp continued until early 1980 when the couple separated. During the summer of that year Tripp had begun to live with, and had become pregnant by, another man. Valentine knew of Tripp's new relationship and was aware of her pregnancy. Despite this knowledge, Valentine, in late August and early September of 1980, was attempting to effect a reconciliation with Tripp.

During the night of September 5–6, 1980, Valentine became distraught as a result of Tripp's continued reluctance to return to him. He wrote several suicide letters and left his apartment to purchase a gun. He left his apartment on a motorcycle with a knife in his possession. He testified that his motorcycle stalled near a cleaners where Tripp worked. Valentine went into the cleaners to attempt one last time to win Tripp back.

Tripp, who was working when he arrived at the cleaners, was not prepared to return to Valentine. In fact, she told Valentine that she might be leaving Maine and moving to California. After Tripp repelled Valentine's advances, he told her he was going to see the children. Tripp refused to let him see the children.

At that point, Valentine testified, he was more angry than he had ever been before in his life—the pressure was relentless and he felt he "had to get out of there." He testified he couldn't remember anything else.

A number of witnesses were in the vicinity of the cleaners when Tripp was killed. They testified that they heard screams come from the cleaners. The witnesses saw Valentine over Tripp's body, which had been stabbed in the neck and upper chest ten or eleven times. While he was still over Tripp's body Valentine was heard to say "Yeah, I did it" and "I can't live like this anymore." The witnesses saw Valentine get up from Tripp's body and walk to a telephone in the cleaners. He called the police from the cleaners and reported a homicide had taken place. He told the police that his name was Valentine and that he had committed the homicide.

Police officers arrived while Valentine was still speaking on the telephone. The officers placed him in custody. He asked

1. At the time of Valentine's trial 17–A M.R.S.A. § 59 (Supp.1980) provided in pertinent part:

   1. When the defendant enters a plea of not guilty ... by reason of insanity, he shall also elect whether the trial shall be in 2 stages....

   2. If a two-stage trial is elected by the defendant, there shall be a separation of the issue of guilt from the issue of insanity.... A. The issue of guilt shall be tried first and the issue of insanity tried only if the jury returns a verdict of guilty....

   B. Evidence of mental disease or defect ... shall not be admissible in the guilt or innocence phase of the trial for the purpose of establishing the defense of a lack of criminal responsibility....

   Since the trial of this case, the legislature repealed section 59. P.L. 1981, ch. 324, § 21. The pertinent criminal code provisions relating to bifurcated trials are now codified at 17–A M.R.S.A. § 40 (Supp.1981).

one of the officers for a cigarette and asked "The nigger is dead, right?" Valentine also told the officers that he had "blown" his retirement with only two years left to go.

## II. THE DENIAL OF VALENTINE'S MOTION TO ACQUIT

On appeal, Valentine does not argue that the evidence presented by the State at trial was insufficient to allow a jury to conclude that it was Valentine's conduct which caused Tripp's death. Rather, Valentine relies upon expert medical testimony offered by the defense to contend that his motion for judgment of acquittal should have been granted as a jury could not, as a matter of law, have found rationally the existence of the requisite culpable mental state.

At trial a psychiatrist and two psychologists testified on Valentine's behalf. Their testimony related to Valentine's mental condition at the time he killed Tripp and the effect that condition had upon his conduct. Much of the medical testimony attempted to prove Valentine's inability to recognize the nature and consequences of his acts and his inability to control his behavior. One witness testified that Valentine's mental state and conduct resulting therefrom was similar to that of a man who spends all his money on a Christmas present for his child, becomes frustrated at his inability to assemble it and smashes the present. Such a person, he suggested, appreciates the significance of what he has done only after the fact.

At the time of Valentine's trial 17–A M.R.S.A. § 58(1–A) (Supp.1980) provided "[i]n a prosecution for a crime which may be committed intentionally, knowingly or recklessly, where such culpable state of mind is a necessary element, the existence of a reasonable doubt as to such state of mind may be established by evidence of an abnormal condition of mind."[2] Valentine contends that the expert medical testimony he offered at trial established a reasonable doubt that he intentionally or knowingly

killed Tripp and, therefore, that the trial court was required to grant his motion for a judgment of acquittal on the murder charge. The defendant misapprehends both the specific functions of the two stage procedure of a bifurcated trial and the nature and effect of the medical testimony which he produced at trial. Stage one of a bifurcated trial determines *only* the issue of guilt or innocence. It is only after the fact-finder determines guilt that the issue of the insanity defense will arise in stage two of the proceedings. Lack of criminal responsibility resulting from mental disease or defect is not an issue in stage one of a bifurcated trial, and, indeed, our statutory framework precludes the admission of evidence on that issue in stage one of the proceedings.

■ Evidence of an abnormal state of mind may be admissible in stage one of the proceeding when a culpable state of mind is an element of the crime charged. *See State v. Mishne*, Me., 427 A.2d 450, 454 (1981); *State v. Sommer*, Me., 409 A.2d 666, 668–70 (1979); *State v. Burnham*, Me., 406 A.2d 889, 894 (1978). To be admissible in stage one of a bifurcated trial, however, the evidence must be relevant to culpability. "[E]vidence that a defendant may have been suffering from mental or emotional difficulties does not necessarily suggest that defendant's conduct was not intentional or knowing, as those terms are defined in the criminal code." *Mishne*, 427 A.2d at 454, *citing Sommer*, 409 A.2d 666.

■ In the present case, little of the expert testimony was probative on the issue of guilt—the only issue in stage one of the trial. Much of the psychiatric testimony was to the effect that Valentine may have lacked the ability to appreciate the wrongfulness of his acts or to control them. Although that evidence may be relevant as to criminal responsibility (stage two), the issue of the sufficiency of Valentine's *insanity* defense is not now before us. The medical

---

**2.** 17–A M.R.S.A. § 58 (Supp.1980) was repealed by P.L. 1981, ch. 324, § 19. The pertinent provisions of the criminal code are now codified at 17–A M.R.S.A. §§ 38, 39 (Supp. 1981).

evidence offered by Valentine certainly would not preclude the jury from rationally determining, in stage one of the trial, that Valentine acted with a culpable state of mind, *viz.*, that he intentionally or knowingly caused Tripp's death. 17–A M.R.S.A. § 201 (Supp.1980). Accordingly, we conclude the Superior Court correctly refused to acquit Valentine of either murder or manslaughter. *See* 17–A M.R.S.A. § 11(3) (Supp.1980).[3]

## III. ADMISSIBILITY OF DEFENDANT'S STATEMENTS

At the police station Valentine asked a police officer if "she was going to breath anymore," began to sob, said several times that he "had blown it" and asked "Why did I do it?" After this exchange, and approximately two hours after the killing, a Lt. Martin interviewed Valentine.

Martin first asked Valentine his name, date of birth, residence and employer. Martin next read him the *Miranda* warnings, and asked him if he understood his rights. Valentine said yes he did understand his rights and he produced two *Miranda* cards from his wallet which he said he used while in the U. S. Coast Guard. Martin asked if Valentine wished to talk with a lawyer. Valentine did not respond. Martin asked him a second time if he wanted to speak to a lawyer. Valentine began a series of statements admitting he killed Tripp, with long pauses between each statement. During these pauses Martin again occasionally asked, without response, if Valentine wished to talk without a lawyer present. After approximately an hour, the interview terminated when Valentine apparently saw that Martin was writing as he spoke, and said: "You're writing . . . . Do this—no, don't . . . . Do you know a good lawyer?" Martin responded by asking if the defendant would consent to a search of his apartment. The defendant responded in

part: "No, I want to see a lawyer about that." Martin then terminated the interview.

◾ Valentine argues that it was error to admit the statements he made during the interview with Martin. He did not request the trial court to make specific findings regarding the admissibility of the statements. The trial court made no detailed findings nor did it specifically refer to the degree of proof it would apply. In these circumstances we review the entire record in the light most favorable to the court's ruling to determine whether the record will support (1) a finding of compliance with the *Miranda* decision by a preponderance of the evidence, *State v. Bleyl*, Me., 435 A.2d 1349 (1981); *State v. Simmons*, Me., 435 A.2d 1090 (1981); and (2) a finding of voluntariness beyond a reasonable doubt, *State v. Bleyl*, 435 A.2d 1349; *State v. Collins*, Me., 297 A.2d 620 (1972).

◾ We initially address the second inquiry, *i.e.*, whether Valentine's statements were voluntarily made. The record contains no suggestion of threats, promises or even a coercive atmosphere at the police station. Moreover, Valentine does not suggest on appeal that his statements were involuntary. We are satisfied that the record supports a finding of voluntariness beyond a reasonable doubt.

The thrust of Valentine's claim of a *Miranda* violation goes to whether the police did, in fact, comply with the requirements of *Miranda*. Valentine contends that he did not *expressly* waive his rights as required for admission of results of custodial interrogation. The State, while conceding the defendant was in custody, suggests that there was no interrogation. We do not accept either view.

The fact that Valentine was under arrest and at the police station leaves no doubt that he was, in fact, in custody during the interview with Martin. The statements made by Valentine, however, were made

---

**3.** Because we determine that the Superior Court correctly denied Valentine's motion for acquittal on the murder charge, we need not address and intimate no opinion upon the question of whether an *erroneous* refusal to acquit him of murder would have required a new trial in light of the manslaughter verdict.

after Martin had fully explained his *Miranda* rights to him and Valentine told Martin that he understood those rights. Moreover, the only question Martin asked Valentine at this time related to whether Valentine wanted to speak to an attorney. We do not think that a police inquiry which relates to whether a suspect wishes to speak to an attorney can reasonably be construed to be words that "the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 308 (1980).

We are not here required to hold that the police had an affirmative duty to stop Valentine's spontaneous statements. Once Valentine objected and asked for an attorney the police ˚terminated the interview. *See Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378, 385 (1981); *State v. O'Neal*, Me., 432 A.2d 1278, 1283–84 (1981). We affirm the trial court's decision that under these circumstances the police acted correctly and did not violate Valentine's Fifth Amendment rights.

### IV. EVIDENCE OF PRIOR ACTS

■ Over defense objection, the court allowed a prosecution witness to testify that in the summer of 1979 she once heard Valentine beat Tripp for an hour. The witness testified that during the beating Valentine would stop to smoke or fix a drink and then continue hitting Tripp. Following this incident, Valentine said: "She was damn lucky I wasn't wearing my knife. I reached for it and it was gone." Another witness, again over objection, testified that on June 30, 1980, Valentine, who was apparently intoxicated, chased Tripp up a street with a knife. After Tripp escaped, Valentine gave the knife to the witness and said: "I was going to kill the bitch."

Evidence of prior bad acts is not admissible to prove that a defendant acted on a particular occasion in conformity with his past behavior. M.R.Evid. 404. When such conduct was directed at the victim of the crime the evidence may be admissible, however, to prove motive or intent. *See* M.R. Evid. 404 (Advisers' Note). Here, the State initially sought to prove Valentine's conduct was knowing or intentional. Accordingly, intent was in issue at trial and the evidence was properly admitted.

### V. EXCLUSION OF COAST GUARD RECORDS

■ Valentine attempted to introduce Coast Guard records from his personnel file to establish that his conduct on board ship had been exemplary. The records contained conduct ratings given every six months. Valentine had received perfect 4–0 ratings which indicated he had no disciplinary problems while in the Coast Guard. The trial court permitted Coast Guard Commander Haines to testify that he never personally observed Valentine lose his temper and that Valentine had a reputation on board ship for keeping his temper. The witness was not allowed, however, to testify as to the contents of Valentine's personnel file.

On appeal, Valentine relies upon 17–A M.R.S.A. § 203(2)(B) (Supp.1980) to contend that the Coast Guard records were relevant to show his lack of any tendency toward extreme anger.[4] In view of the manslaughter verdict, any error generated by the exclusion of evidence on that issue would, of necessity, be harmless.

Since we find no merit in Valentine's arguments we must affirm his conviction of manslaughter.

The entry is:

Judgment affirmed.

All concurring.

---

4. We express no opinion upon the validity of Valentine's reliance upon the provisions of 17–A M.R.S.A. § 203(2)(B) (Supp.1980) as authorizing the admission of such evidence. We note, however, that Section 203(2)(B) provides only that "evidence demonstrating only that the actor has a tendency towards extreme anger or extreme fear shall not be sufficient, in and of itself, to establish the reasonableness of his reaction." On its face, Section 203(2)(B) does not address the question of the *admissibility* of evidence that the defendant does or does not have a tendency toward extreme anger or fear.