STATE of Maine

v.

Steven HABERSKI.

Supreme Judicial Court of Maine.

Argued June 9, 1982.

Decided Aug. 17, 1982.

Charles K. Leadbetter (orally), Pasquale J. Perrino, Jr., Asst. Attys. Gen., Augusta, for plaintiff.

Hall, DeSanctis & Schultz, Julio DeSanctis (orally), Richard W. Hall, Bangor, for defendant.

Before McKUSICK, C. J., and GODFREY, NICHOLS, CARTER, VIOLETTE and WATHEN, JJ.

ROBERTS, Justice.

Following a jury trial in Superior Court, Penobscot County, Steven Haberski was convicted of murder, 17–A M.R.S.A. § 201(1)(A). On appeal, Haberski claims that (1) the Superior Court erred when it denied his motions to challenge the members of the grand jury on the grounds of prejudicial pretrial publicity, (2) the trial court erred when it refused his motion for a mistrial following an improper comment by the prosecutor, and (3) there was insufficient evidence to support the murder verdict. We affirm the judgment of the Superior Court.

## I. FACTS

The victim, Kirk Haberski, was Haberski's second wife. Haberski and his wife resided in Bangor with his two children from a prior marriage. Haberski testified that he was a dealer in antiques. He returned to his home in Bangor from a business trip on Saturday, May 17, 1980. From

Saturday until Tuesday, the day he killed the victim, Haberski continuously ingested large amounts of cocaine. During that period he slept approximately two hours. Haberski testified that on Tuesday, May 20, believing that (1) his wife Kirk was having an affair, (2) someone was going to attempt to kill him, and (3) his children were sexually abused, he left Bangor with his family by car to drive to his parents' home in Connecticut. Haberski testified that as they left Bangor he was "scared for [his] life" and that his wife told him that she was the only one who could save him now. Haberski also testified that his wife then told him that she had sexually abused his son, Jason. On the highway Haberski threw his wallet and Kirk's pocketbook out the window of the car. Haberski's bizarre behavior resulted in an argument between him and his wife regarding who should drive the car. Haberski eventually stopped the car on a dirt road in Carmel. He dragged his wife, who was screaming, into the woods, pushed her to the ground and pulled a gun from his pocket. He repeatedly hit his wife with the gun which discharged on several occasions.

The state medical examiner testified that Kirk Haberski's death was caused by "bullet wounds of the head, neck and chest and the lacerations of the scalp with hemorrhage and bruising of the brain." The victim's body had a total of approximately thirty injuries. She had been shot three times.

A witness whose house was immediately adjacent to the scene of the killing testified she heard a woman screaming, heard two shots, five or ten minutes later heard a third shot, then watched Haberski's car leave the scene. Haberski drove off, stopped, pushed his children out of the car, and began to drive back toward Bangor. As he drove toward Bangor Haberski was met by an unmarked police car which gave chase and pursued him at high speed until Haberski crashed his car in the outskirts of the city.

Other testimony at trial would have allowed a jury to rationally find that Haberski had previously beaten his wife, and that he had previously told a friend that his marriage to the victim was not working and he was going to "get rid" of the victim. In addition, there was testimony that after the killing Haberski had commented that he "forgot the shovel" the day he killed the victim, that the victim deserved it, and that he had been known to do unusual things before and make them work.

## II. GRAND JURY

The above described killing did not go unnoticed by the news media. In fact, the culmination of the high speed chase into Bangor which ended with Haberski's arrest was filmed by a local television station. In addition to being used as a news item, the film was also shown to the jury during Haberski's trial. The killing was also the subject of various newspaper articles published in the Bangor area.

On June 2, 1980, a regularly scheduled session of the grand jury sitting in Penobscot County was to commence receiving evidence. Early on the morning of June 2, 1980, Haberski filed twenty-one motions in the Superior Court. Twenty of these motions sought to challenge named members of the grand jury. The twenty-first motion was entitled "Motion to Challenge Name Unknown to Defendant a Member of the Grand Jury." All twenty-one motions relied upon identical grounds, to wit:

that said Grand Juror possesses a state of mind which is predisposed to the Defendant's guilt, that said mental predisposition exists as a result of the massive amount of publicity in this matter and that such mental state prevents said Grand Juror from acting impartially, all as set out in the affidavit attached hereto and incorporated by reference herein.

In pertinent part, the affidavit attached to the motions stated:

That since the occurrence of the crime for which our client stands charged there has been an extraordinary amount of media coverage of said Defendant . . .

That said media coverage has been pervasive in all forms of media: Newspaper, television and radio . . .

That said publicity has been adverse to said Defendant and presumes Defendant's guilt . . .

That any person being exposed to said publicity would be influenced by it . . .

That on information and belief the members of the Grand Jury have been exposed to said adverse media coverage and have been adversely effected by same . . .

That on information and belief the members of the Grand Jury have formed a belief as to the guilt of the Defendant.

The Superior Court conducted a hearing relating to the above motions. Counsel for the state and defense counsel were both present. At the hearing defense counsel represented to the court that there had been a significant amount of pretrial publicity regarding Mr. Haberski and that such publicity had acted "in such a manner as to arouse in the public mind a sense of [ill] will and vindictiveness . . . ."

In support of his motion counsel presented the court with five newspaper articles printed by the Bangor Daily News, a newspaper published in Bangor. Exhibit A was a straightforward news article dated May 21, 1980, headlined "Man Is Charged In Killing Of Wife." Accompanying the article was a photograph of Haberski's son peering over the dashboard of a car described as a sheriff's cruiser with the caption "Where's Mommy?" Exhibit B, dated May 22, was an article entitled "Probable Cause Found After Carmel Slaying" with an accompanying photograph of Haberski in the company of a Maine ·State Police officer captioned "En Route To Arraignment." Exhibit C consisted of four letters to the editor written in response to the caption "Where's Mommy?" in Exhibit A. The first letter labeled the photo "appalling journalism," the second "cruel, unfeeling and in bad taste," the third "cruel and senseless," and the fourth "tabloid journalism." Exhibit D was an article entitled "Oregon Death Probe May Be Reopened." It reported that Haberski's first wife had died of acute narcoticism caused by ingestion of "alcohol, cocaine, codeine and a massive amount of morphine." A doctor in Oregon was quoted as saying authorities there were "always suspicious" of the death of Haberski's first wife. The article contains an innuendo that Haberski and his wives had been involved with drugs. Exhibit E was an article entitled "Oregon Officials Interested In Carmel Slaying."

Defense counsel relied upon this publicity, in addition to other radio and television publicity which he said existed, to argue that the individual members of the grand jury were incapable of acting in an impartial manner. At one point during the hearing defense counsel also moved "that the Court examine the Grand Jurors . . . in camera regarding the . . . publicity."

In reply the State argued in part that the publicity the defendant relied upon was not so prejudicial that reasonable people exposed to it would tend to be rendered incapable of exercising impartial judgment. Counsel for the State told the court that it was her custom, and her intention in this case, to remind the grand jurors of their obligations, to instruct the jurors that if any had a personal bias which, as a result, would make it impossible for them to render an impartial decision, that person should excuse himself from the subsequent grand jury deliberations and vote. Counsel for the State also stated, "I certainly invite Your Honor to speak to them as well, if you feel that's necessary, but beyond that, it would simply be [an] excessive and unnecessary interference with a perfectly legal and proper proceeding . . . ."

The Superior Court justice acknowledged that he was aware of the television and radio broadcasts as well as the newspaper coverage but stated that he could not find "anything egregiously prejudicial about the publicity in this case." He accordingly denied Haberski's motion.

Subsequent to the return of a murder indictment Haberski again relied on pretrial publicity as grounds for a motion to dismiss the indictment. After hearing, the Superior Court also denied that motion. No transcript of that hearing has been included with the record on appeal. Haberski does

not now argue that the denial of his motion to dismiss the indictment was error. Rather, he argues only that the Superior Court erred when it denied his individual motions to challenge the members of the grand jury.

We are aware that issues involving the rights of a defendant as they relate to grand jury proceedings have generated much controversy and few clear principles. *See Beck v. Washington,* 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962); *Martin v. Beto,* 397 F.2d 741 (5th Cir. 1968); *id.* (Thornberry, J., concurring); *Gorin v. United States,* 313 F.2d 641 (1st Cir. 1963), cert. denied, 379 U.S. 971, 85 S.Ct. 669, 13 L.Ed.2d 563 (1965); *United States v. Anzelmo,* 319 F.Supp. 1106 (E.D.La.1970); *United States v. Hoffa,* 205 F.Supp. 710 (S.D.Fla. 1962), cert. denied, *Hoffa v. Lieb,* 371 U.S. 892, 83 S.Ct. 188, 9 L.Ed.2d 125 (1962); *Commonwealth v. Monahan,* 349 Mass. 139, 207 N.E.2d 29 (1965). In the context of a post-indictment motion to dismiss we have previously recognized that the news media, through constant bombardment of the public with reports which tend to arouse public vindictiveness, may, in some instances, poison the public state of mind to such a degree that "the potential for bias and prejudice become manifest." *State v. Warren,* Me., 312 A.2d 535, 539 (1973).

From its origin, the grand jury evolved to become a tribunal of citizens which, in some circumstances, resolutely stands between an individual and a vindictive sovereign. *See Wood v. Georgia,* 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569, 580 (1962); *Hale v. Henkel,* 201 U.S. 43, 59, 26 S.Ct. 370, 372, 50 L.Ed. 652, 659 (1906); *Johnson v. Superior Court,* 15 Cal.3d 248, 257, 539 P.2d 792, 798, 124 Cal.Rptr. 32, 38 (1975) (Mosk, J., concurring).[1] As it evolved in this country, the grand jury also came to stand between an ordinary citizen and an aroused public "to make sure as is humanly possible that one after whom the mob and public passion are in full pursuit is treated fairly ...."

*Beck,* 369 U.S. at 587, 82 S.Ct. at 979, 8 L.Ed.2d at 128 (Douglas, J., dissenting). It is indeed fortunate that in our present society defendants only infrequently encounter a vindictive sovereign or a public demanding vengeance and retribution. The prophylactic role of the grand jury, therefore, is rarely required. Nevertheless, in extraordinary circumstances it may play a valuable role.

When a defendant relies upon adverse pretrial publicity to challenge members of the grand jury or to seek the dismissal of an indictment, often the underlying rationale for the relief is that the publicity has poisoned the public state of mind to such a degree that impartial consideration by members of the public, from which the grand jury panel is drawn, has become impossible. Haberski here makes just such an argument. The publicity of which Haberski complains, however, was not so invidious as to arouse a public vindictiveness which would preclude impartial consideration. There exists an important distinction between publicity regarding a crime which may be characterized as "adverse" and that type of publicity which may be characterized as "invidious."

Here, at worst, the publicity implied that Haberski's first wife had died under suspicious circumstances and that Haberski was involved with drugs. The receipt of such knowledge by the public, however, would not arouse public indignation to such a degree that the citizenry would thereafter irrationally demand retribution. Such information simply is not of such a nature as to preclude subsequent rational and impartial consideration.

Although Haberski claims that additional publicity in the form of radio and television broadcasts existed, he does not suggest that publicity was any different from that discussed above. In this regard, we merely note that it is *not* a prerequisite to a valid

---

1. The two commonly-referred-to examples of this role are the English grand jury's refusal to indict the Earl of Shaftesbury in 1681, see G. Edwards, *The Grand Jury* 29 (1906), and the refusal, in 1734, of a New York Grand Jury to indict Peter Zenger for criminal libel against the governor of New York. *See* Kuh, *The Grand Jury "Presentment": Foul Blow or Fair Play?* 55 Colum.L.Rev. 1103, 1108–09 (1955).

proceeding that grand jurors know nothing whatsoever about the events which will be presented to them.[2] Indeed, it is to be expected that the members of the grand jury will have some knowledge of the events which have occurred in the area in which they sit. *Cf. Hale*, 201 U.S. at 65, 26 S.Ct. at 375, 50 L.Ed. at 661; *Monahan*, 349 Mass. at 154, 207 N.E.2d at 39; *Commonwealth v. Woodward*, 157 Mass. 516, 516, 32 N.E. 939, 939 (1893).

■ We recognize that at the hearing below defense counsel requested the court to examine the grand jurors in camera. Defense counsel did not, however, specify the nature and purpose of such an examination. Although the publicity herein did not justify an individual examination of the grand jurors, we do not intend by our decision in this case to inhibit in any way the right and duty of the presiding justice, upon appropriate request or upon his own initiative, to remind the grand jurors of their oath and to inquire of the panel whether such publicity would interfere with their sworn obligation to "present no man for envy, hatred or malice ..." but to "present things truly as they come to [their] knowledge, according to the best of [their] understanding." *See* 15 M.R.S.A. § 1252.

■ We are concerned that the prosecutor in this instance apparently thought it proper to usurp the function of the presiding justice by instructing the grand jury as to their duties and obligations. The grand jury does not function as an arm of the prosecution. The more appropriate response by a prosecutor to any such concerns would be to request additional instructions from the presiding justice. In this instance, Haberski did not specifically request that the court take such action. Rather, he challenged the members of the grand jury and sought an individual examination of the jurors. We decide only that, given the cir-

cumstances of the case, the relief he sought was unnecessary.

## III. PROSECUTORIAL MISCONDUCT

Haberski contends the trial court erred when it denied his motion for a mistrial. During the prosecutor's cross examination of Haberski the following exchange occurred:

HABERSKI: I don't know why I did what I did. I live it every day and I'm sorry it ever happened.

PROSECUTOR: Sure Kirk Haberski is sorry it happened, too.

HABERSKI: I'm sure she is.

Defense counsel objected and moved to strike the prosecutor's comments. The court sustained the objection and struck the comments. Thereafter, the jury was excused and defense counsel moved for a mistrial which the court denied.

■ Any attempt to inject an irrelevant issue and thereby prejudice the jury against the defendant is clearly improper. The use of such tactics directly contravenes the prosecutor's duty to insure that a criminal defendant receives a fair trial. *State v. Reilly*, Me., 446 A.2d 1125, 1128 (1982) (quoting *State v. Wyman*, Me., 270 A.2d 460, 463 (1970)). *See Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935). Prosecutors should, by now, be well aware of this Court's condemnation of prosecutorial tactics designed to render a criminal trial a trial by combat rather than a civilized proceeding. *See Reilly*, 446 A.2d at 1128–30; *State v. Ledger*, Me., 444 A.2d 404, 409–11 (1982); *see also McNabb v. United States*, 318 U.S. 332, 340, 63 S.Ct. 608, 612, 87 L.Ed. 819, 824 (1943); *United States v. Banks*, 383 F.Supp. 389, 391–92 (D.S.D.1974).

As we noted in *Reilly*, however, "[p]rompt and appropriate curative instruc-

---

**2.** Often in colonial times the members of the grand jury themselves gave witness against a defendant. The following notations may be found in court records from 1702:

> Wee Present Ellizabeth Crucy of Kittery for fornication which is Since Said to be Married

> Witness John Addams one of the Jury We Present Abraham Batting and Mary Young now his wife of yorke for fornication Witness York Juriors

4 *Province and Court Records of Maine* 281 (N. Allen, Jr., ed. 1958).

tions, under some circumstances, may well alleviate the damage caused by such [improper] conduct." 446 A.2d at 1129. In this case, when the jury returned to the courtroom the trial justice promptly explained to the jury that he had struck the comment from the record and instructed them that they must ignore it completely. Although we condemn without hesitation such tactics, in light of the trial justice's prompt and complete curative instructions we cannot say such improper conduct requires us to vacate this conviction.

## IV. SUFFICIENCY OF THE EVIDENCE

■ Haberski does not dispute the fact that he was the person who killed the victim. Instead, he argues on appeal that the evidence presented at trial was insufficient to permit the jury rationally to conclude beyond a reasonable doubt that he possessed a mental state sufficient to support a murder verdict. He contends that his prodigious intake of drugs either rendered him incapable of forming the requisite culpable state of mind, see 17–A M.R.S.A. § 58(1–A) (Supp.1980), or resulted in his intoxication which, he argues, compelled a reasonable doubt as to the existence of a culpable state of mind. See 17–A M.R.S.A. § 58–A(1) (Supp.1980).[3]

At trial, one psychiatrist testified that when Haberski killed the victim he (1) was suffering from chronic cocaine abuse, (2) was intoxicated, though not significantly, by cocaine, and (3) suffered an "organic delusional syndrome." He said that Haberski's ingestion of cocaine moderately impaired his ability to control his impulses. He also testified that Haberski was the first person he had seen suffering from cocaine intoxication and that he had a "hard time"

believing Haberski's story as Haberski had related it.

A second psychiatrist testified that at the time of the killing the defendant was suffering from chronic cocaine abuse and cocaine intoxication and possessed a *suggestion* of an "organic delusional syndrome." When questioned regarding Haberski's state of mind just before he killed the victim, the doctor said, "I do not believe his thoughts were formulated clearly ...." The doctor also said that he had a "gut feeling" of "[a] certain amount of unease with the story ...."

As it relates to the issue of sufficiency of the evidence, Haberski's conviction must stand unless, viewing the evidence in the light most favorable to the prosecution, on all the evidence presented no trier of fact rationally could find proof of guilt beyond a reasonable doubt. *State v. Mahaney*, Me., 437 A.2d 613, 621 (1981); *State v. Perfetto*, Me., 424 A.2d 1095, 1097 (1981); *State v. Lagasse*, Me., 410 A.2d 537, 542 (1980). In addition to the somewhat equivocal psychiatric testimony, the jury also heard evidence, as related in Part I, *supra*, that Haberski had previously beaten his wife, and that he had previously told a friend that his marriage to the victim was not working and he was going to "get rid" of the victim. In addition, there was testimony that after the killing Haberski had commented that he "forgot the shovel" the day he killed the victim, that the victim "deserved it," and that he had been known to do unusual things before and make them work. Finally, the jury also heard evidence that the third and final shot came between five or ten minutes after the first two gunshots, that Haberski fled the scene immediately after the shooting and proclaimed his inno-

---

**3.** Although Haberski pled both not guilty and not guilty by reason of insanity and the trial justice instructed the jury on the issue of insanity, Haberski does not argue that the jury, as a matter of law, was compelled to find that he lacked substantial capacity to conform his conduct to the requirements of the law or that he lacked substantial capacity to appreciate the wrongfulness of his conduct. See 17–A M.R. S.A. § 58(1) (Supp.1980). Since this trial took

place the cited provisions of Title 17–A have been repealed by our Legislature and reenacted, in a manner not here pertinent, as 17–A M.R.S.A. §§ 37, 38 & 39. See P.L. 1981, ch. 324, §§ 14, 19 & 20. For a general discussion of these issues, albeit in the context of bifurcated trials, see *State v. Valentine*, Me., 443 A.2d 573, 576–77 (1982); *State v. Mishne*, Me., 427 A.2d 450, 454–60 (1981).

cence as soon as he was taken into custody. Viewing this evidence in a light most favorable to the State, it is clear that the jury could find rationally that when Haberski killed his wife he possessed a mental state sufficient to support a murder verdict.

In conclusion, we have carefully examined the entire record before us and all of the arguments raised by the defendant on appeal, and we have found nothing which constitutes reversible error. The conviction must be affirmed.

The entry is:

Judgment affirmed.

McKUSICK, C. J., and GODFREY, NICHOLS, CARTER, VIOLETTE and WATHEN, JJ., concurring.

CARTER, Justice, with whom McKUSICK, C. J., joins, concurring.

I concur in the result reached and the reasoning employed in the majority opinion. I write separately in order to articulate what I believe is an important distinction between this case and those cases involving challenges to traverse jurors.

This Court has noted that "[i]t would seem self-evident that a criminal defendant is entitled to an impartial jury, whether it be grand or traverse." *State v. Warren*, Me., 312 A.2d 535, 539 (1973). The contours of the requirement of impartiality in the case of either grand or traverse juries can only be ascertained, however, by taking into account the distinct functions of these two bodies. By parsing the word "impartial" in the context of the historically-based functions and purposes of the grand and traverse juries, I submit that it becomes readily apparent that the concept of impartiality imposes quite different requirements upon the mind-set of grand jurors than it does upon that of traverse jurors.

The differing functions of the grand and traverse juries were aptly explained in *United States v. Nunan*, 236 F.2d 576 (2d Cir. 1956), *cert. denied*, 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 665 (1957), a case involving a claim to quash an indictment on the basis of exposure of grand jurors to pre-indictment publicity about the offense. In that decision, Judge Medina observed:

> But we are not dealing here with alleged bias or prejudice by a petit jury, caused by widespread publicity during or just prior to a trial of the issues, as was the case in *Meyer v. Cadwalader*, C.C.E.D.Pa., 49 F. 32 and *Griffin v. United States*, 3 Cir., 295 F. 437. In such a situation much would depend upon the character of the publicity, proof that it was of such a nature as to be likely to make an impression on the jurors, and the steps taken by the trial judge to mitigate or remove its effect. Instructions that jurors must avoid reading newspapers or listening to or looking at radio and television commentators and that their verdict must be based solely on the evidence introduced in the case in court, will generally suffice. But there must be a careful appraisal of the possibility or likelihood of extraneous influence. And, indeed, there is good sense in this, since petit jurors must remain passive spectators of the court room drama.

> But a Grand Jury is not confined to a passive role, but may and often should proceed on its own initiative. 4 Stanford L.Rev. 68, 69, 77–8; Dession, From Indictment to Information, 42 Yale L.J. 163, 176. That it is induced to such action by newspaper reports forms a continuum with its historic function of ferreting out crime and corruption, and is in no way inconsistent with its duty to decide on and in accordance with the evidence adduced before it.

236 F.2d at 593 *quoted in United States v. Myers*, 510 F.Supp. 323, 325 (E.D.N.Y.1980) and *United States v. Mandel*, 415 F.Supp. 1033, 1062–63 (D.Md.1976); *see State v. Winsett*, Del., 200 A.2d 692, 693–94 (1964). Indeed, it is a well-accepted principle that a grand juror's prior opinion as to the guilt of the accused or his interest in the prosecution does not serve to disqualify him from service.

> The theory is that a grand jury is an accusatory, not a judicial, body and, as such, has the right and duty to act on its

own information, however acquired. Moreover, the oath taken by grand jurors contemplates that they may be called upon to act in the cases of both enemies and friends and, since grand jurors live in the vicinity of the place where the crime was committed, it may be assumed in many instances that they know better than others the character of the parties and of the witnesses.

1 *Wharton's Criminal Procedure* § 197 (12th ed. 1974) (footnotes omitted). Traverse jurors are not permitted the same degree of bias or interest. *See Lewisohn v. State*, Me., 433 A.2d 351, 355 (1981) (traverse juror must lay aside his opinion or impression and render a verdict based on the evidence presented in court); *Christian v. State*, Me., 268 A.2d 620, 624 (1970) (juror "should be impartial, indifferent and under no bias or prejudice"). *Compare* 15 M.R. S.A. § 1252 (grand juror shall present no man for envy, hatred or malice; present things as they come to your knowledge) *with* 15 M.R.S.A. § 1254 (juror shall give verdict "according to law and evidence given you"). Thus, fair treatment for "one after whom the mob and public passion are in full pursuit," *Beck v. Washington*, 36 U.S. 541, 587, 82 S.Ct. 955, 979, 8 L.Ed.2d 98, 128 (1962) (Douglas, J., dissenting); see majority opinion, slip op. at 8, does not require a fully dispassionate, objective, unbiased, unprejudiced weighing of the evidence, as would be required of a traverse juror. Rather, it is sufficient if a grand jury is committed to the idea that an individual subject to grand jury investigation should not be put to the rigors and burden of prosecution for no reason other than the mob sentiment and public passion against him; that he not be presented for prosecution solely because of "envy, hatred or malice. . . ." *See* 15 M.R.S.A. § 1252.

In this case, the majority observes:

The publicity of which Haberski complains, however, was not so invidious as to arouse *public vindictiveness* which would preclude *impartial consideration* . . . . The receipt of such knowledge by the public, however, would not arouse *public indignation* to such a degree that the citizenry would thereafter *irrationally demand retribution.* Such information simply is not of such a nature as to preclude subsequent *rational and impartial consideration.*

449 A.2d at 377. (emphasis added.)

I agree with this characterization of the publicity at issue in this appeal. The publicity was not of so extreme a character as to incapacitate a grand juror from properly carrying out his assigned function.